UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TRAVIS AUGUSTINE,

                              Petitioner,

                                           9:14-CV-01230

v.

                                           (MAD/TWD)

DALE ARTUS, Superintendent,

                              Respondent.
_____

APPEARANCES:                         OF COUNSEL:

TRAVIS AUGUSTINE
09-A-2824
Petitioner pro se
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902

HON. ERIC T. SCHNEIDERMAN        LISA E. FLEISCHMANN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Respondent
120 Broadway
New York, New York 10271


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

      Presently before this Court is the timely pro se petition of Petitioner Travis Augustine,

seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  (Dkt. No. 1.)  Petitioner brings

this proceeding challenging a judgment of conviction entered on June 2, 2009, following a jury

trial in Greene County Court, the Hon. George J. Pulver, Jr., Greene County Court Judge,

_____

      [1]  This matter has been referred to this Court for Report and Recommendation, pursuant
to 28 U.S.C. § 636(b) and Northern District Local Rule 72.3(c), by the Hon. Mae A. D'Agostino,
United States District Judge.

presiding. (Dkt. No. 10 at 17[2].) On May 1, 2009, Petitioner was convicted of murder in the

second degree (N.Y. Penal Law ("PL") § 125.25(1)) for the murder of Martha Conners;

aggravated cruelty to animals (N.Y. Ag. & Mkt. Law ("AM") § 0353(A)) for the shooting death

of Martha's Bulldog Savannah; and two counts of criminal possession of stolen property (PL §

165.45 (2) and (5)). *Id*.; Dkt. No. 11-5 at 1, 114-15.

On June 2, 2009, Petitioner was sentenced to twenty-five years to life on the second

degree murder conviction; two years on the aggravated cruelty to animals conviction, to run

consecutively; and two to four years on each of the criminal possession of stolen property

convictions, also to run consecutively. *Id*.

I.    **PETITIONER'S DIRECT APPEAL**

    A.    **Appellate Division Third Department**

Petitioner filed a counseled appeal to the Appellate Division Third Department in which

he made the following arguments: (1) his indelible right to counsel was infringed when he was

interrogated by State Police officers regarding this case without counsel present while he was in

the Greene County jail on a probation violation and had allegedly been assigned defense counsel

on the violation charge; (2) his statement to State Trooper Lischak on July 27, 2008, was elicited

in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); (3) his right to counsel

was violated by the trial court's refusal to conduct an inquiry in court into his complaints about

his assigned defense counsel and to assign new counsel; (4) his conviction for second degree

murder was against the weight of the evidence; (5) his conviction for aggravated cruelty to

---

    [2] Page references to documents identified by docket number are to the numbers assigned
by the CM/ECF docketing system maintained by the Clerk's Office.

animals was against the weight of the evidence; and (6) his convictions for criminal possession of stolen property in the fourth degree were against the weight of the evidence.  (Dkt. No. 10 at 25-26.)

The Appellate Division unanimously affirmed the judgment of conviction on November 10, 2011.  *See People v. Augustine*, 932 N.Y.S.2d 247 (3d Dept. 2011).  In doing so, the Court determined that the County Court had not erred in denying Petitioner's motion to suppress the statements made to the police on July 27, 2008, and July 29, 2008, because Petitioner had failed to satisfy his burden of showing that he was actually represented by counsel on the probation violation charge at the time he was questioned and made the statements.  The Court found that inasmuch as the evidence was equivocal on the question of whether Petitioner was being represented by counsel on the probation violation when he made the statements, he had failed in his burden.  *Id*. at 250.

The Appellate Division also concluded that there had been no proof of entry, which requires "actual appearance or communication" by counsel prior to the time Petitioner gave the statements to police.  *Id*. at 251.  The evidence showed that Petitioner had not requested counsel, attorneys were not permitted to call inmates at the jail, and no one from the Public Defender's Office had come to see Petitioner prior to the questioning.  *Id*.  In addition, the Court found that the police were not required to Mirandize Petitioner prior to speaking with him on July 27, 2008, because the questioning was investigatory rather than accusatory.  *Id*. at 250.

The Appellate Division determined that given the lack of factual support for Petitioner's complaints regarding defense counsel, the timing of the request for new counsel, and the counsel's adequate pretrial representation, the County Court did not deprive Petitioner of his

3

right to effective counsel. *Id.* at 251. The Appellate Division also analyzed the trial evidence and concluded that Petitioner's convictions were not against the weight of the evidence. *Id*. at 251-52.

### B.    New York State Court of Appeals

The New York Court of Appeals granted Petitioner's application for leave to appeal. *People v. Augustine*, 950 N.Y.S.2d 109 (2012) (Table). The issues raised by Petitioner on his counseled appeal to the Court of Appeals were: (1) the lower court erred in rejecting Petitioner's claim that his right to counsel was violated when police interrogated him without counsel on two occasions while he was incarcerated on charges for which he was represented by counsel; (2) his conviction for aggravated cruelty to animals was not supported by sufficient evidence; (3) the lower court erred in failing to suppress Petitioner's statement to police on July 27, 2008, insofar as it was conceded that he was in custody and not Mirandized; and (4) the lower court erred in rejecting his argument that he was denied his constitutional right to counsel when the trial court refused his pretrial request for new counsel without providing him the opportunity for a hearing. (Dkt. No. 10-2 at 7.)

The Court of Appeals unanimously confirmed the judgment of conviction, assuming without deciding that Petitioner's indelible right to counsel was violated, and concluding that any error in that regard was harmless beyond a reasonable doubt. *People v. Augustine*, 969 N.Y.S.2d 849, 850 (2013). According to the Court of Appeals "[t]here [was] no reasonable possibility that the introduction of the two challenged statements affected defendant's conviction in view of the other evidence, including two counseled statements to police and testimony of numerous witnesses, that overwhelmingly established his guilt." *Id.*

4

The Court of Appeals also determined that Petitioner's claim of insufficient evidence to support his conviction of aggravated cruelty to animals was unpreserved, and that his remaining claims were without merit.[3]  *Id.*  Petitioner did not file a petition for a writ of certiorari with the United States Supreme Court.  (Dkt. No. 1 at 4.)

### C.    Grounds for Habeas Review

The grounds for habeas review set forth in Petitioner's petition are as follows:

1.    Petitioner's indelible right to counsel was violated when the police interrogated him on two occasions while he was incarcerated on unrelated charges for which he was represented by counsel;

II.    The State court erred in failing to suppress Petitioner's July 27, 2008, statement to police as it was conceded that he was in custody, he was not issued his *Miranda* rights, and he was represented by counsel on unrelated charges;

III.    The State court erred in rejecting Petitioner's argument that he was denied his constitutional right to counsel when the trial court denied his request for new counsel without first giving him an opportunity to be heard on the matter; and

IV.    Petitioner's conviction for aggravated cruelty to animals was not supported by legally sufficient evidence.

(*See generally* Dkt. No. 1.)

## II.    BACKGROUND

### A.    *Huntley* Hearing on Petitioner's Request for Suppression of January 27, 2008, and January 29, 2009, Statements to State Police Investigators

As a part of his omnibus motion, Petitioner sought to have statements given to law enforcement officers on July 27, 2008, and July 29, 2009, suppressed.  (Dkt. No. 10 at 5.)

---

[3]  According to his petition, other than his direct appeal, Petitioner has not previously filed any petitions, applications, or motions, such as motions under N.Y. Criminal Procedure Law § 440, with respect to the judgment of conviction in any state or federal court.  (Dkt. No. 1 at 4.)

County Court Judge Pulver held a *Huntley* hearing on January 22, 2009, and January 30, 2009, to determine, *inter alia*, the admissibility of the statements. *Id*. at 6; Dkt. No. 10-5.

By way of background, on June 19, 2008, a two-count violation of probation charge was filed against Petitioner. (Dkt. No. 1-1 at 14.) On July 1, 2008, the Hon. Thomas W. Baldwin, Town Justice in the Town of Cairo, issued an arrest warrant on the probation violation charges commanding that upon his arrest, Petitioner be brought before the court for arraignment. *Id*. at 18. Petitioner was arrested on the warrant and brought before Judge Baldwin for arraignment on July 18, 2008, at approximately 2:00am by State Trooper Lane, and bail was set. (Dkt. No. 10-5 at 36-37.) No attorneys were present at the arraignment. *Id*. at 37.

According to Judge Baldwin, he told Petitioner he had a right to counsel at the arraignment and asked him if he wanted counsel. (Dkt. No. 10-6 at 21.) Petitioner indicated he did not know whether or not he wanted an attorney. *Id*. at 15. He did not ask for counsel at any point during the arraignment. *Id*. at 18. Judge Baldwin told Petitioner he was going to set bail, and Petitioner could decide if he wanted counsel because the Public Defender's office had someone at the jail on a daily basis, and they would do an intake on him. *Id*.

In an Arraignment Memorandum prepared by him at the time of the arraignment, Judge Baldwin wrote on the form after "Counsel Assigned," "Greene Co. Public Defender's Office." (Dkt. No. 1-1 at 20.) The significance of writing "Greene Co. Public Defender's Office," according to Judge Baldwin, was that he was letting the Public Defender's Office know that there was a person in the Greene County Jail who may or may not be eligible, and that it was for the Public Defender's Office to determine eligibility. (Dkt. No. 10-6 at 16-17.) The Memorandum indicates that bail was set at $2,000 cash or $5,000 bond. (Dkt. No. 1-1 at 20.)

6

Petitioner ultimately was represented by the Public Defender's Office on the probation violation charges and appeared before Judge Baldwin with counsel on July 29, 2008. *Id*. at 25. Judge Baldwin was unaware whether Petitioner had spoken with anyone from the Public Defender's Office prior to the appearance. *Id*.

On July 27, 2008, while Petitioner was in the Greene County Jail on the probation violation, Trooper Lischak came to speak with him regarding Martha Conners, who was being investigated as a missing person. (Dkt. 10-6 at 28.) Petitioner was told that Lischak wished to speak with him and that he was not under arrest, and Petitioner was given the option of speaking with Lischak or not. *Id*. at 29-33. Petitioner agreed to speak to Lischak about Martha. *Id*. at 30. Lischak prepared a synopsis of his interview with Petitioner which stated that Petitioner had last seen Martha on July 11, 2008, when they took a trip to the Layde/Rome area. (Dkt. Nos. 1-1 at 24.) According to the synopsis, when Petitioner and Martha parted company, she sold him her truck for $200.00 and left her cell phone with him in case she wanted to reach him during a trip she was taking to the Niagara area. *Id*; Dkt. No. 10-5 at 58-60. Petitioner also told Lischak that Martha had left her credit card in the truck, and he had used it for gas. (Dkt. No. 1-1 at 24.) Lischak testified at the *Huntley* hearing that Petitioner was not a suspect when he spoke to him on July 27, 2008. (Dkt. No. 10-5 at 81.)

State Police Investigator Aguiar, designated lead investigator in this case, testified at the *Huntley* hearing that the State Police learned the evening of July 28, 2008, that Martha's son Matthew Conners had found her body buried underneath her deceased Bulldog Savannah on her property. *Id*. at 91-95. Both had been shot in the head, Savannah multiple times. (Dkt. No. 11-4 at 57-59, 78.) Matthew had visited Petitioner at the jail for about twenty minutes earlier in the

7

day in an attempt to obtain information regarding his mother's whereabouts.  *Id*. at 92; Dkt. Nos. 1-1 at 22, 76.

When Aguiar went to the property where the body was discovered the evening of July 28, 2008, he learned that prior to going to jail, Petitioner had Martha's truck, credit card, and cell phone in his possession.  (Dkt. No. 10-5 at 96.)  A decision was made for Aguiar and State Police Investigator Houck to contact Petitioner again.  *Id*.  at 97.  Houck gave Petitioner *Miranda* warnings prior to the interview conducted at the Greene County Jail at around 2:38am the morning of July 29, 2008.  *Id*. at 98-100.  According to Aguiar, Petitioner waived his *Miranda* rights and agreed to talk to the investigators.  *Id.*

Aguiar's notes of the interview state that Petitioner told the investigators he last saw Martha on July 10, 2008, at a campground where she was with a man named Pete, who had a white Celica.  (Dkt. Nos. 1-1 at 26-27.)  She was packed up to go with Pete, and she told Petitioner Pete would bring her home.  (Dkt. Nos. 1-1 at 26-27; 10-5 at 99.)  Petitioner again indicated that Martha told him she would sell him her truck for $200.00 and gave him her cell phone.  *Id*. at 26.  Petitioner also told investigators that Martha had not called him after she left for Niagara with Pete.  *Id*. at 32.

According to the notes, Petitioner told the investigators that the Bulldog had been ill and either died or been put down on July 5 or 6, 2008.  *Id*. at 30-31; Dkt. No. 10-5 at 104-05.  When asked by the investigators how the Bulldog could have ended up on top of Martha in the grave, Petitioner kept repeating he did not know and walked over and banged on the jail door, indicated he wanted to leave, and left the interview.  (Dkt. No. 10-5 at 106-07.)

In denying Petitioner's motion to suppress, Judge Pulver found that no true attorney-

8

client relationship was established between Petitioner's July 18, 2008, court appearance and the

July 27, 2008, and July 29, 2008, statements to Troopers, and that the statements were voluntary.

(Dkt. No. 10 at 116.)

> **B.      August 14, 2008, Interview with State Police Investigators**

Subsequent to speaking with Petitioner on July 29, 2008, Aguiar received a note from

Petitioner to Sergeant Leis at the Greene County Jail indicating that he wished to speak to the

public defender and the Bureau of Criminal Investigation.  (Dkt. No. 11-4 at 37.)  A meeting was

arranged for August 14, 2008, and attended by Petitioner, Public Defender Dominic Cornelius,

and State Police Investigators Aguiar, Donn, and Houck.  *Id*.; Dkt. No. 1-1 at 81.  *Miranda*

warnings were again executed (Dkt. No. 1-1 at 35-38), and Petitioner's taped statement was

taken at the Greene County Jail.  (Dkt. No. 11-4 at 38-39.)  A transcript of the interview was

made and entered as an exhibit at trial.  (Dkt. Nos. 1-1 at 36-99; 11-4 at 39.)

During the interview, Petitioner told the Investigators that everything he had told them on

July 29, 2008, about camping with Martha and Pete and the white Celica had been fabricated.

(Dkt. No. 1-1 at 86.)  According to Petitioner, he could not explain the fabrication except that he

"just needed more of an alibi while he was using her car."  *Id*.

He told the Investigators the last time he had seen Martha was on July 2 or 3, 2008, when

she dropped him off on North Street so that he could go to his friend Evelyn's house.  (Dkt. No.

1-1 at 48-50.)  Martha had indicated she wanted some private time, so he stayed at Evelyn's

house, and on July 5, 2013, he hitchhiked back to Martha's where he stayed two or three days

waiting for her to return.  *Id*. at 50-51.  Martha did not return while Petitioner was there.  *Id*.

According to Petitioner, Martha's truck was at her property with her cell phone and credit card

9

inside when he returned there. *Id*. at 51. Martha's son Matthew came by on July 5, 2008, to pick up camper frames he wanted. *Id*. at 55.

When Petitioner ran out of food, he took Martha's truck, her cell phone in case she tried to reach him, and her credit card, and went to Rome, New York to stay with family. (Dkt. No. 1-1 at 56-60.) Petitioner used Martha's credit card at a gas station, Blockbuster, and Walmart. *Id*. at 61. Petitioner stayed in Rome until he was picked up on the outstanding warrants. *Id*. at 65.

During the interview, Petitioner told the Investigators he believed Matthew had something to do with his mother's disappearance. *Id*. at 66-71. According to Petitioner, Matthew and his mother fought like crazy, and Matthew had discussed ways to kill her. *Id*. at 66.

### C.   Petitioner's Pre-Trial Request for the Assignment of New Counsel

Petitioner's trial began on April 23, 2009. (Dkt. No. 11 at 1.) On April 16, 2009, the trial court received an April 10, 2009, note from Petitioner requesting that he be assigned new counsel because his current counsel was "ineffective on all levels," and Petitioner did not feel properly represented. (Dkt. Nos. 1 at 11; 1-1 at 119, 122.) According to Petitioner, his Public Defender was not ready for trial, had discussed Petitioner's legal business with corrections officers on more than one occasion, did not look into anything Petitioner thought would help his defense, and did not listen to information given him by Petitioner. (Dkt. No. 1-1 at 119.) Instead, counsel asked Petitioner to plead guilty every time he visited. *Id*.

On April 20, 2009, the trial court summoned counsel and Petitioner to discuss the issue on the record. (Dkt. No. 1-1 at 122.) The prosecutor described the timing of the request as "extremely unfortunate" because so much had transpired in the case with which the Public Defender was familiar, and any change in counsel would likely require months of delay in a trial

10

that had been scheduled for a substantial period.  *Id.*  In addition, the prosecutor attested that the Public Defender had made a complete omnibus motion on behalf of Petitioner, which resulted in the court granting a vigorously contested suppression hearing over the course of two days.  *Id.* at 123.  The prosecutor asserted that as far as his office was concerned, the Public Defender's Office had done nothing ineffective, and that there was no good reason to grant an adjournment of the trial for the purpose of a substitution of counsel for Petitioner.  *Id.*

When the court asked Petitioner's counsel if he desired to be heard in the matter, counsel suggested it would be more appropriate to allow Petitioner to address the court and place his feelings on the record.  *Id.*  The court questioned whether that would be appropriate without the aid and assistance of counsel because Petitioner might say something that could be prejudicial to his case.  The court expressed the concern that it was time to remain silent, and he would prefer not to give Petitioner the opportunity to be heard on the issues raised by his request for new counsel for fear Petitioner would prejudice himself in some other way.  *Id*. at 124.  When asked by the court if he agreed with the court's conclusion, Petitioner responded in the affirmative.  *Id.*  The court explained further that the case was very important to Petitioner and the court wanted to make sure it was "completed in the fairest manner as possible, and in being fair to you I feel I don't want to allow you to just stand up and speak."  *Id*.

The Public Defender then said that the prosecutor's comments spoke for themselves, the court had seen the Public Defender handle trials, and he would leave the decision on Petitioner's request to the sound discretion of the court.  *Id.*  The court then denied the request.  *Id.*

11

**D.     People's Case at Trial**

      1.    <u>Martha and Petitioner</u>

Prior to her death, Martha was employed at Price Chopper and the Speed Wash

Laundromat, and also collected and sold scrap metal.  (Dkt. No. 11-1 at 129.)  Martha lived in a

camper with no water, septic, or electricity in a remote area off Old Kings Road in Catskill, New

York.  *Id*. at 124; Dkt. No. 11-2 at 190.  She had a Bulldog, a Golden Retriever, and a Beagle,

along with a number of cats and a ferret.  (Dkt. Nos. 11-1 at 136; 11-2 at 67-68.)

Petitioner moved in with Martha in May or June of 2008 and worked with her in her

scrap metal business.  (Dkt. Nos. 11-1 at 130-31;11-2 at 163.)  According to Matthew, Martha

wanted to help Petitioner get on his feet, so she gave him a place to live, and a way to make

money by helping her with loading and unloading the scrap metal.  (Dkt. No. 11-1 at 131.)

Allison, an old friend of Martha's who had moved out of town a few years earlier came to

visit her on July 2, 2008.  (Dkt. No. 11-2 at 90-91.)  Martha took Allison and her husband to the

Sandman Motel to stay, and Allison and Martha talked until 3:00 or 4:00am when Martha said

she had to get back to the guy who was staying with her.  *Id*. at 94-95.  On July 3, 2008, Allison

and Martha played phone tag, with Martha ultimately speaking with Allison's husband whom she

told she was busy, and that Stotville, where Allison was at the time, was too far for her to drive.

*Id*.  96.  Later in the day, Allison left Martha a voice mail about meeting later at the drive-in.  *Id*.

at 96.  Martha did not respond and Allison never heard from her again.  *Id*. at 97.

Allison worked at Price Chopper on July 3, 2008, and her time card showed that she had

left at 6:00pm.  (Dkt. No. 11-1 at 192-93.)  Martha was scheduled to work from 10:00am to

5:00pm on July 4, 2008, but did not show up for work. *Id.* at 195. Her employment was ultimately terminated. *Id.*

A witness, Donald, testified at trial that Petitioner arrived at Evelyn's house on Main Street close to evening on July 3, 2008. (Dkt. No. 11-2 at 130.) Donald and Evelyn described Petitioner's clothing as dirty and greasy and thought he looked like he had been working all day. *Id.* According to Evelyn, it was not unusual for Petitioner's clothes to be dirty. *Id.* at 179. Petitioner had a cut on his wrist that looked like a dog bite, and Petitioner said he had hurt it working on a dirt bike. *Id.* Petitioner had told Donald that he had a black truck, but when they went out to buy cocaine that evening, Donald saw Martha's yellow truck parked on North Street. *Id.* at 131-32. When Donald asked Petitioner why he did not tell him he had Martha's truck, Petitioner told him that Martha was visiting a relative in Maryland, and he was not supposed to be using the truck, so he did not want anyone to know. *Id.*

After Donald and Petitioner obtained the cocaine, Petitioner asked that they stop at Martha's camper so he could get a needle to shoot the cocaine. (Dkt. No. 11-2 at 135.) Petitioner was gone for fifteen to twenty minutes. *Id.* at 155. They then went back to Evelyn's and Petitioner shot up the cocaine. *Id.* at 137-38. Petitioner stayed at Evelyn's house until it became dark on July 5, 2008. *Id.* at 175. Evelyn testified that it was not unusual for Petitioner to have Martha's truck and cell phone or to park her truck on North Street. *Id.* at 180-81.

Petitioner's half-brother, Frank, testified at trial that he had received a call from Petitioner the evening of July 6, 2008, and Petitioner told him he was going to move to the Rome area where Frank and other members of his family lived. (Dkt. No. 11-3 at 62-63, 66-67.) According to Frank, Petitioner asked him how to get rid of a body, and Frank told him to dig a six foot hole,

13

put the body in and cover it with dirt, place a dead animal in the hole, and finish covering it with dirt.  *Id*.  Frank testified he had been given that information by a CSI investigator in Florida.  *Id*.  Records of usage of Martha's cell phone show calls back and forth between Frank and Petitioner on July 6, 2008.  (Dkt. No. 11-4 at 16-17.)

Cell phone tower records reveal that Martha's phone was in the Catskill area from July 1 through July 6, 2008, at 8:21pm, and thereafter in the Utica area until his arrest there on July 17, 2008.  (Dkt. No. 11-4 at 12-13.)  When Frank saw Petitioner in Lee Center a day or two after speaking with him on the phone, Petitioner was driving Martha's yellow truck, and when Frank asked him if he had stolen it, Petitioner assured him it had not been reported stolen.  (Dkt. 11-3 at 68.)  Frank testified that he and Petitioner had a discussion about the phone call in which Petitioner had asked Frank how to get rid of a body.  *Id*.  According to Frank, Petitioner first told him that Martha had come out with a gun and was shooting at him, and he had to grab the gun and it accidently went off, but then said "Naw, I just shot that bitch in the face."  *Id*.

While he was in the Rome area, Petitioner established a relationship with a woman named Scarlet, and they spent most of their time together.  (Dkt. No. 11-3 at 91-92.)  According to Scarlet, at times when Petitioner's cell phone rang, he told her he did not want to answer it because someone was trying to reach him, and he would have to explain to the person that his mother was in jail, which he did not want to do.  *Id*. at 96.  Petitioner wanted Scarlet to talk to the person and tell him his mother was in jail, but Petitioner was arrested before that happened.  *Id*. at 97.  Petitioner's cousin, Nicole, with whom he stayed in Rome, testified that she could not recall if she had answered Petitioner's cell phone when it rang or if he had asked her to answer because he did not want to answer it.  *Id*. at 60.

14

2.   Matthew and Discovery of Martha's Body

Martha's son Matthew had moved to the Sandman Motel before July 2008, and it was his

understanding his mother would move in there when he moved out.  (Dkt. No. 11-1 at 132.)

Matthew stayed at his mother-in-law's the night of July 3, 2008, and before daylight on July 4,

2008, Matthew left with his wife and mother-in-law to visit family on Long Island.  *Id*. at 133.

Matthew returned to Catskill the morning of July 7, 2008, to pick up his and his wife's things as

they had decided to stay on Long Island with his wife's family.  *Id*. at 134-35.

While he was back in Catskill, Matthew went to his mother's property with a scrap dealer

who had a flat bed tow truck to remove a baling machine from the property to scrap for money.

*Id*. at 137; *see also* Dkt. No. 11-2 at 6-7.  Matthew did not see his mother while he was at the

property.  (Dkt. No. 11-1 at 136.)  Matthew returned to Long Island the same day.  *Id*. at 138.

Although Matthew told law enforcement he had seen the Bulldog Savannah, he later said he had

just seen her chain hanging out of the dog coop and the Beagle and Golden Retriever.  *Id*.  Cell

tower records support that Matthew traveled to the New York/Long Island area on July 4, 2008,

and remained there until he returned to Catskill the morning of July 7, 2008, and returned to

Long Island later in the day.  (Dkt. No. 11-4 at 10-11.)

Matthew recalled trying without success to get through to his mother by telephone around

the time he returned to Catskill on July 7, 2008.  (Dkt. No. 11-1 at 137.)  He believed that it was

his mother who picked up the phone on one occasion and passed it to Petitioner, who told him

that they were on their way to North or South Carolina, and that his mother wanted him to take

care of the animals.  *Id*. at 138.

In mid-July 2008, Matthew attempted without success to reach Martha by phone a few

times a day. *Id.* at 140.  Around July 18, 2008, Matthew called Jeffrey, a man with whom

Martha had previously had a relationship, told him he had not heard from his mother for two or

three weeks, and asked him to check out Price Chopper and the Sandman Motel.  (Dkt. No. 11-2

at 65-66.)  Jeffrey was told at Price Chopper that Martha no longer worked there and learned at

the Sandman Motel that Martha was supposed to move in but never did.  *Id.*  He also went to

Martha's property and testified at trial that it looked as though she had not been there in a while.

*Id.* at 67-68.  The animals had not been fed or cared for, and it smelled awful inside the camper

because of the cats and ferret.  *Id.*  According to Jeffrey, he knew something was wrong because

Martha always kept the camper clean, and the door was unlocked, which was unusual.  *Id.*

Jeffrey told Matthew what he had found, and Matthew told him he would come up as

soon as he got money for bus tickets.  *Id.* at 70-72; Dkt. No. 1-1 at 141.  Matthew and his wife

sold necklaces and their wedding bands to come up with money for bus tickets and arrived home

on July 26, 2008.  (Dkt. No. 11-1 at 142.)  The cell tower records show Matthew remaining in

Long Island until July 26, 2008, around 3:41pm when he returned home.  *Id.* at 11. Matthew went

to his mother's property, and it looked like no one had been there except for tire tracks made

when Jeffrey had checked for him.  *Id.* at 142-43.  That evening, Matthew reported to the police

that his mother was missing.  *Id.* at 143-45.

When Matthew told the Troopers about the telephone conversation in which Petitioner

told him that Martha and Petitioner were traveling to North or South Carolina, the Troopers told

him Petitioner was in jail, and that when he was arrested he had Martha's truck, cell phone, and

credit card.  *Id.*  Matthew went to visit Petitioner in jail on July 27, 2008, to find out about his

mother.  *Id.* at 145.  According to Matthew, Petitioner told him his mother was heading toward

Niagara on foot.  *Id*. at 145.  When Matthew asked why Petitioner had Martha's cell phone and truck, Petitioner told him that Martha had sold him the truck, and that he had a receipt, and had asked him to hold on to the phone so she could keep in touch with him.  *Id.*   Matthew testified that when he asked Petitioner about Savannah, Petitioner told him that Savannah had become sick and died, and that Martha had buried him in back of the camper.  *Id*.

After visiting Petitioner, Matthew went back to Martha's property with his wife, his mother-in-law, and her boyfriend Eddie.  *Id*. at 146.  They did not find any signs of a grave behind the camper and but then started walking around and noticed a large spot of dirt with a circle of stones and a cross and began digging.  *Id*. at 147-48; Dkt. No. 11-2 at 27.  Matthew and Eddie began digging with an old pick and a shovel, and Matthew uncovered a dog he recognized as Savannah.  (Dkt. No. 11-1 at 150-51.)  The dog looked like its head was all smashed and bloody.  (Dkt. No. 11-2 at 30.)  Matthew called law enforcement, and then noticing that the dirt below the dog was very soft, continued digging along with relatives who had come with more shovels.  *Id*.  They eventually uncovered what looked like Martha's blanket, and when they ripped it open and saw an arm, they stopped digging and Matthew again called law enforcement. *Id*. at 31-33.  The State Police arrived at approximately 10:38pm that evening and exhumed Martha's body from the grave site.  (Dkt. No. 11-2 at 189-193.)

   3. <u>Forensics</u>

Autopsy revealed a hole in the front portion of the left side of the top of Martha's head caused by a bullet.  (Dkt. No. 11-4 at 56-58.)  The cause of death was determined to be a gun shot wound to the head.  *Id*.  It appeared that the bullet was a .22 long gun projectile.  *Id*. at 59. The pathologist opined, based upon the location and condition of the body, that Martha had been

dead at least a week and possibly for several weeks or more. *Id*. at 54-57. There was no sign of insect activity on Martha's body. *Id*. at 68.

The wildlife pathologist who examined Savannah's body found multiple bullets in the head area, any one of which would have killed almost instantly. *Id.* at 73-78. Savannah was found to be otherwise in relatively good health. *Id*. at 78. The wildlife pathologist opined that Savannah's body had been placed in a plastic bag soon after death because there were no flies. *Id*. at 82. Based upon the moderate to extensive rotting of tissue, he believed that Savannah had been deceased for a two to three week period, although it could possibly have been four weeks. *Id*. at 82-83.

The State Police found two .22 long rifles in Martha's camper after her death, a Remington .22 and a Winchester .22. (Dkt. No. 11-3 at 23-24.) Also found were a Super X shell casing from a .22 and an expended Winchester .22 cartridge case in a pile of debris. *Id*. at 26-27. The rifles were test fired, and the .22 caliber bullet removed from Martha's head was examined along with the bullet fragments from the dog. *Id*. at 28. The expended cartridge case was found to have come from the Winchester. *Id*. The projectile removed from Martha's head was consistent with having been shot from the Winchester, but sufficient individual characteristics necessary for a positive identification were missing. *Id*. Blood stain swabs from blood droplets found inside the camper after the discovery of Martha's body were found to match Martha's DNA. *Id*. at 34-35.

A handmade cross with hand made lettering was found lying on the ground at the grave site. (Dkt. No. 11-3 at 12.) The swabbing of the cross and nails holding it together revealed no DNA, and no fingerprints were found. *Id.* at 36-37. Writing on the cross was described by the

People's forensic expert as being "original writing" that was "freely and naturally prepared." *Id*. at 113. The forensics expert attempted to match the handwritten lettering on the cross to handwriting samples from Martha, Matthew, and Petitioner. *Id*. at 110-12. According to the expert, the texture and grains of the wood did not allow for a free flowing line quality to be generated, so there were breaks in the writing. *Id*. at 113. The breaks in the writing created a limitation in evaluating authorship. *Id*. Evaluation of authorship was also made more difficult by the significant amount of overwriting. *Id*. at 113, 115. Despite spending five days comparing the handwriting samples to the writing on the cross, because of the overwritings, the limited nature of the writing, and the texture of the wood, the expert concluded that none of the three could be identified as having prepared the questioned writing. *Id*. at 122.

### E.    Defense Case at Trial

The sole witness called by Petitioner at trial was Juliann, the mother of Matthew's wife, Josephine. (Dkt. No. 11-4 at 129.) Juliann testified that her daughter finished ninth grade in the special education program and had a second or third grade reading level. *Id*. at 130. She testified that she was familiar with her daughter's handwriting. *Id*. When shown the pictures of the writing on the cross, which included, "Be good in doggy heaven," Juliann identified the writing as that of her daughter. *Id*. at 133-34. When asked if the phrase "Be good in doggy heaven," was familiar to her, she testified that the phrase was familiar because when her daughter, who loved animals, was young her dog was killed by a car. *Id*. at 134. Juliann recalled that Josephine had written "doggy heaven" for the dog. *Id*.

According to Juliann, she was very suspicious when she saw "doggy heaven" written on the cross and spoke to Investigator Aguiar about it. *Id*. at 136. Aguiar told her to get it out of her

mind because they already had the person responsible for Martha's death. *Id.* He tried to

convince her that the evidence against Petitioner was so overwhelming that she should not testify

on his behalf. *Id.* at 137. Juliann also talked to the District Attorney once but then decided she

did not want to talk to either of them again because she did not want to ruin her relationship with

her daughter. *Id.* at 136.

On cross-examination, Juliann testified that she had not told Aguiar it was her daughter's

handwriting on the cross, but that the phrase "doggy heaven" concerned her. *Id.* at 138. She also

testified that she had gone to see Petitioner in jail on her own, and he had told her he would give

her something if she helped him out because he did not kill Martha. *Id.* at 144. He mentioned a

car or house or anything she wanted because he was innocent, and she believed his claim of

innocence. *Id.*

On redirect-examination, Juliann testified that she knew Petitioner did not have a lot of

money, and that she would never have accepted anything from him. *Id.* at 145. She only wanted

the person responsible to suffer the consequences. *Id.* According to Juliann, she was testifying

because she believed Petitioner was innocent, and because her daughter had written "Be good in

doggy heaven" on the cross. *Id.* at 145. On recross-examination, Juliann acknowledged that she

had asked Josephine if she had written on the cross and Josephine responded that she had not.

*Id.* at 146.

## III.   STANDARD OF REVIEW

### A.   Exhaustion Requirement under the Antiterrorism and Effective Death Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs

applications of incarcerated state court defendants seeking federal habeas corpus relief. *See* 28 U.S.C. § 2254. Before a federal court may consider an application for habeas corpus relief pursuant to 28 U.S.C. § 2254, the petitioner must generally have exhausted all the remedies available in the courts of the state in which he or she was convicted.[4] 28 U.S.C. § 2254(b)(1)(A); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief."); *Jones v. Murphy*, 694 F.3d 225, 246-47 (2d Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1247 (2013) ("Under AEDPA, a prisoner in custody pursuant to a state court judgment must generally exhaust state court remedies before seeking federal habeas corpus review."). "Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoner's federal rights." *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011) (citation and internal quotation marks omitted); *Strogov v. Attorney General*, 191 F.3d 188, 191 (2d Cir. 1999) (a habeas petitioner has fairly presented his claim when he has "[i]nformed [the State] courts of all the essential factual allegations and essentially the same legal doctrine [asserted] in his federal petition") (citation and internal quotation marks omitted).

> Passage through the state courts, in and of itself, "is not sufficient." *Picard* [*v. Connor*, 404 U.S. 270, 275 (1971)]. To provide the State with the necessary 'opportunity,' the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by

---

[4] Exhaustion may be excused where it appears that "there is an absence of available state corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." *See* 28 U.S.C. § 2254(b)(1)(B)(i)-(ii).

> invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)."

*Wilens v. Superintendent of Clinton Correc. Fac.*, No. 11-CV-1938 (JFB), 2014 WL 28995, at *5 (E.D.N.Y. Dec. 31, 2013).[5]

Petitioner bears the burden of proving exhaustion. *Colon v. Johnson*, 19 F.Supp. 2d 112, 119-20 (S.D.N.Y. 1998) (citations omitted).

## B.    Procedural Default

A state prisoner's procedural default in the state courts will also bar federal review unless the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he or she can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A procedural default occurs in one of two ways. "First, if the state prisoner fails to exhaust his state remedies in a manner in which, were he to return to the state courts with his unexhausted claim, those courts would find the claim barred by the application of a state procedural rule," the habeas court must deem the claim procedurally defaulted. *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (citation and internal quotation marks omitted). "Alternatively, a procedural default occurs if the state court's rejection of a federal claim rests on a state law ground    such as the operation of a state procedural rule    that is both independent of the federal question and adequate to support the judgment . . . , [and] the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state

---

[5] Copies of unreported cases cited herein will be provided to Petitioner. *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

22

procedural bar." *Id.* (citations and internal punctuation and quotation marks omitted). A petitioner's procedural default precludes federal habeas review "if the last state court rendering a judgment in the case rests its judgment on the procedural default." *Harris v. Reed*, 489 U.S. 255, 262 (1989). Where a state court has expressly relied on a procedural default, federal habeas review is foreclosed even if the state court also addressed the merits of the federal claim. *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (federal habeas review barred where state held claim "not preserved for appeal" but then ruled on the merits of the claim "in any event").

### C. Review of State Court Decisions on the Merits Under the AEDPA

Under the AEDPA, an application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Recognizing the principle that "[s]tate courts are adequate forums for the vindication of federal rights . . . , AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, ___U.S. ___, 134 S.Ct. 10, 15-16 (2013); *see also Cullen,* 131 S.Ct. at 1398 ("This is a difficult to meet [ ] . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt . . . .") (citation and internal quotation marks omitted).

"For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its

disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).  Under the

AEDPA, a summary disposition by a state court constitutes a disposition on the merits.

*Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Where AEDPA's deferential standard of review

applies, "[a] state court's determination of a factual issue is presumed to be correct, and may only

be rebutted by clear and convincing evidence." *Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir.

2010) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 131 S.Ct. 1693 (2011)).  "[A] state court

factual determination is not unreasonable merely because the federal habeas court would have

reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

In determining whether a state court has adjudicated a claim "on the merits," a federal

habeas corpus court must classify the state court decision as either "(1) fairly appearing to rest

primarily on federal law or to be interwoven with federal law or (2) fairly appearing to rest

primarily on state procedural law." *Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006).

Decisions in the first category are deemed to have been made "on the merits" of the federal

claim.  *Id*.  A state court's rejection of a petitioner's remaining contentions as "without merit"

constitutes an adjudication on the merits rendering the AEDPA standard of review applicable to

those remaining claims.  *See Francolino v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004) (it will be

presumed that a claim was adjudicated on the merits where it was one of the remaining

contentions that the appellate court stated was "without merit," and the habeas petition should be

reviewed under AEDPA standards).

A decision "on the merits" is contrary to clearly established federal law when it is either

contrary to Supreme Court precedent on a question of law or opposite to a relevant Supreme

Court case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06

(2000). "Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citation and internal quotation marks omitted). "[F]ederal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). "[C]ircuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court . . . [and] cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 2155 (2012) (citation and internal quotation marks omitted).

A state court unreasonably applies federal law when it correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner. *Lockyer*, 538 U.S. at 75. An erroneous application of federal law is not necessarily an unreasonable one.[6] *Williams,* 529 U.S. at 413. "It is settled that a federal habeas corpus may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson*, ___ U.S. ___, 133 S.Ct. 1990, 1992 (2013) (quoting *Richter*, 562 U.S. at 101). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.

_____

[6] Nevertheless, as interpreted by the Second Circuit, "although some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Mask v. McGinnis*, 252 F. 3d 85, 89 (2d Cir. 2001).

Federal habeas corpus review is limited to determining whether petitioner is in custody in violation of the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. §§ 2241(c), 2254(a); *see also Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension.").  Federal habeas relief does not "lie for errors of state law."  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  Petitioner has the burden of proving by a preponderance of the evidence that he is in custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); *see also Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal."  *Richter*, 131 S.Ct. at 786.  Where a claim has been adjudicated on the merits by a state court, federal habeas review is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen*, 131 S.Ct. at 1398.

## IV.   ANALYSIS

### A.   Violation of Petitioner's Indelible Right to Counsel

Petitioner claims that his indelible right to counsel was violated when he was interrogated by the State Police on July 27, 2008, and July 29, 2008, regarding Martha Conners, without counsel being present while he was incarcerated on violation of probation charges for which he contends he was represented by counsel.  (Dkt. No. 1 at 8.)   The New York Court of Appeals assuming, without deciding, that Petitioner's indelible right to counsel was violated, determined that "any error was harmless beyond a reasonable doubt . . ." because there was "no reasonable possibility that the introduction of the two challenged statements affected [Petitioner's]

26

conviction in view of the other evidence, including two counseled statements to police and testimony of numerous witnesses, that overwhelmingly established his guilt." *People v. Augustine*, 969 N.Y.S.2d at 850.

In New York State, the indelible right to counsel arises from the provision of the New York State Constitution that guarantees due process of law, the right to effective assistance of counsel, and the privilege against compulsory self-incrimination. *People v. Grice*, 763 N.Y.S.2d 227, 229 (2003) (citing N.Y. Const., art. I, § 6; *People v. Bing*, 559 N.Y.S.2d 474, 477-78 (1990)). "The New York Court of Appeals has consistently interpreted the right to counsel under the New York State Constitution more broadly than the Supreme Court has interpreted the federal right to counsel." *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992). *See Bing*, 559 N.Y.S.2d at 448 ("There are two well-defined situations in which the right [to counsel] is said to attach indelibly under the State Constitution, and a waiver, notwithstanding the client's right to waive generally, will not be recognized unless made in the presence of counsel. The first, similar to the Federal right, deals with waivers after formal proceedings have commenced. The second, recognized only in New York, relates to uncharged individuals in custody who have retained or requested an attorney. Police authorities may not question them in the absence of counsel.") (internal citations omitted).

In *People v. Rogers*, 422 N.Y.S.2d 18, 19 (1979), the New York Court of Appeals held that "once an attorney has entered the proceeding, thereby signifying that the police should cease questioning, a defendant in custody may not be further interrogated in the absence of counsel." In *Bing*, the Court of Appeals explained that *Rogers* recognized the right to counsel even when, as in this case, the interrogation concerns unrelated matters. 559 N.Y.S. 2d at 479. On the other

hand, it is well-established that the Sixth Amendment right to counsel does not attach until

formal adversarial proceedings have been commenced against a criminal defendant.  *See Texas v.*

*Cobb,* 532 U.S. 162, 167-68 (2001); *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)

("Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has

not yet attached, are, of course, admissible at a trial of those offenses.").  Formal adversarial

proceedings against Petitioner with regard to Martha's death had not been commenced when the

State Police spoke with him on July 27, 2008, and July 29, 2008.  (Dkt. No. 10-5 at 98-100.)

"[I]t is not the province of a federal habeas court to reexamine state-court determinations

on state-law questions.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Swarthout.* 562

U.S. at 219 (federal habeas relief does not lie for errors of state law); *Dluhy v. Mazzuca*, No.

9:03-CV-1153 (DNH), 2007 WL 2071742, at * 9 (N.D.N.Y. (July 17, 2007) (it is well-settled

that the New York rule on the indelible right to counsel is broader than the federal rule, and

cannot be a basis for relief under 28 U.S.C. § 2254).  Therefore, the Court finds that Petitioner's

indelible right to counsel argument is not cognizable in this habeas proceeding and recommends

that habeas relief on that ground be denied.

### B.    Failure to Mirandize Petitioner Prior to the July 27, 2008, Interview

Petitioner claims that the trial court erred in failing to suppress his statement of July 27,

2008, to the State Police, given that he was in custody and was not given his *Miranda* rights prior

to speaking with law enforcement.  (Dkt. No. 1 at 10.)  Petitioner raised the claim that his July

27, 2008, statement to law enforcement should have been suppressed under *Miranda* on his

appeal to the New York Court of Appeals.  (Dkt. No. 102 at 343-45.)

The Court of Appeals specifically addressed and rejected Petitioner's indelible right to

counsel and legal insufficiency claims on the animal cruelty claim. The Court then found "[Petitioner's] remaining claims [were] without merit." *People v. Augustine*, 969 N.Y.S. 2d at 850. One of those remaining claims was Petitioner's *Miranda* claim, and the Court's summary finding constitutes an adjudication on the merits rendering the AEDPA standard of review applicable with regard to that claim. *Francolino*, 365 F.3d at 141.

In *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966), the Supreme Court held that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that law enforcement officials must explain the right to him before beginning questioning. *Miranda* violations are subject to harmless error analysis. *See, e.g., Parsad v. Greiner*, 337 F.3d 175, 185 (2d Cir. 2003) (error in admitting pre-*Miranda* statement "was harmless, as petitioner's post-*Miranda* statements, which we have held were properly admitted, were cumulative of his pre-*Miranda* statements"); *Tankleff v. Senkowski*, 135 F.3d 235, 245-46 (2d Cir. 1998) (applying harmless error doctrine to *Miranda* violation). Admission of a statement given in violation of *Miranda* is harmless error unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see also Daniel v. Walsh*, No. 08-CV-2864 (JFB), 2009 WL 3837304, at * 12 (E.D.N.Y. Nov. 17, 2009) ("any *Miranda* violation would be harmless error under the applicable *Brecht* standard due to the overwhelming evidence of petitioner's guilt").

Although the Court of Appeals did not discuss Petitioner's *Miranda* argument as to the July 27, 2008, statement to police, the Court did specifically address Petitioner's indelible right to counsel claim with regard to the trial court's failure to suppress that statement. The Court

concluded that any error in denying Petitioner's motion to suppress the July 27, 2008, statement was "harmless beyond a reasonable doubt." *People v. Augustine*, 969 N.Y.S. 2d at 850. Elaborating on its finding, the Court wrote that "[t]here is no reasonable possibility that the introduction of the two challenged statements affected the defendant's conviction in view of the other evidence, including two counseled statements to police and testimony of numerous witnesses that overwhelmingly established his guilt."[7] *Id*.

This Court can find no basis for concluding that the Court of Appeals' reasoning would be any less applicable to Petitioner's *Miranda* argument involving the same statement and concludes that the Court's determination was neither contrary to, nor did it involve an unreasonable application of, clearly established law under 28 U.S.C. § 2254. *See Kennaugh*, 289 F.3d at 42; *Lockyer*, 538 U.S. at 75. Therefore, the Court recommends that Petitioner's argument for habeas relief under *Miranda* be denied.

### C.   Trial Court's Denial of Petitioner's Pre-Trial Request for Assignment of New Counsel

The Court has construed Petitioner's third articulated ground for habeas relief as a claim that he was deprived of his Sixth Amendment right to effective legal representation because the trial court denied his request for the assignment of new counsel prior to trial. (Dkt. No. 1 at 11-12.) *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("the right to counsel is the right to effective assistance of counsel," quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

---

[7] The Court refers the District Court to the Appellate Division Opinion on Petitioner's direct appeal which includes a detailed description of evidence supporting the jury's guilty verdict against Petitioner. *People v. Augustine*, 932 N.Y.S.2d at 251-52.

30

On his direct appeal, the Appellate Division rejected Petitioner's claim that he was denied the right to counsel after requesting new counsel. *People v. Augustine*, 932 N.Y.S. 2d at 251. In doing so, the Appellate Division noted that Petitioner's request for new counsel to the trial court contained generalized complaints about the representation being provided by the Public Defender, that the letter was received less than a week before trial so that substitution would have delayed the trial for months, that the Public Defender's pre-trial performance had been adequate, and that Petitioner had agreed with the trial court's advice that he should remain silent to protect his interests. *Id*. Petitioner raised the deprivation of counsel argument again in his appeal to the Court of Appeals (Dkt. No. 10-2 at 46), and it was one of the "remaining claims" the Court summarily denied on the merits on appeal, rendering the claim subject to review under the AEDPA review standard. *People v. Augustine*, 969 N.Y.S. 2d at 850.

"While a defendant has a right to counsel of his choice under the Sixth Amendment, it is not an absolute right. Absent a conflict of interest, a defendant in a criminal case does not have the unfettered right to retain new counsel." *United States v. Brumer*, 528 F.3d 157, 160 (2d Cir. 2008) (internal quotation marks and ellipsis omitted). The right to counsel of choice does not extend to defendants who require counsel to be appointed for them, although they are still entitled to effective legal representation. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006).

The Supreme Court has made clear that the Sixth Amendment does not guarantee a "meaningful relationship" between an accused and his counsel. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). Moreover, not every restriction on counsel's time or opportunity to investigate or to consult with a client or otherwise prepare for trial violates a defendant's Sixth Amendment

right to counsel.  *Id*. at 11.

As noted by the prosecutor, the Petitioner requested the appointment of new counsel a short time before the trial was scheduled to begin, and allowing new counsel would likely have resulted in a substantial delay of the trial.  (Dkt. No. 1 at 122.)  It is well-settled that a trial court has "wide latitude in balancing the right to counsel of choice against the demands of its calendar."  *Gonzalez-Lopez*, 548 U.S. at 152; *see also Brumer*, 528 F.3d at 160-61 (affirming denial of application to replace counsel due to "delay and inefficiency that might ensue"); *United States v. Konstantin*, 280 F. App'x 54 (2d Cir. 2008) (summary order) (affirming denial of adjournment to appoint new counsel where defendant "displeased with his current counsel" made request one week before trial).

Petitioner's Public Defender had made a complete pre-trial omnibus motion and had vigorously participated in a two-day *Huntley* hearing on Petitioner's request that his July 27 and 29, 2008, statements be suppressed.  *Id*. at 123.  Furthermore, as the Public Defender pointed out when he left the determination of Petitioner's request to the trial court's discretion, that the court had previously witnessed him trying cases.  *Id*. at 124.  In addition, Petitioner acknowledged that he understood the trial court's articulated concern that were he to speak to his reasons for wanting new counsel, he might very well prejudice his defense, and he made the choice not to do so.  *Id*. at 123-24.

Furthermore, under *Strickland*, 466 U.S. at 687, in order for Petitioner to succeed on a claim that the denial of his request for new counsel supports a denial of effective assistance of counsel under the Sixth Amendment, he is required to show not only that counsel's performance was deficient, but also that the deficiency prejudiced him.  To demonstrate prejudice, Petitioner

must demonstrate "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). Petitioner has failed to link any of his general complaints with regard to his Public Defender with any specific deficiencies or negative consequences suffered as a result, nor has the Court found any basis for concluding that his Public Defender was ineffective. Therefore, Petitioner has fallen far short of establishing prejudice under *Strickland*.

Under the circumstances presented, the Court finds that the trial court's decision to deny Petitioner's request for the assignment of new counsel made shortly before trial, particularly in light of the Public Defender's adequate pretrial representation, was not contrary to, or an unreasonable application of, federal law, and further finds that there is no showing in the record that Petitioner was prejudiced by his counsel's performance. Therefore, the Court recommends that Petitioner's request for habeas relief on the grounds that he was denied the right to effective counsel under the Sixth Amendment be denied.

**D.    Petitioner's Claim that his Conviction on Aggravated Animal Cruelty was not Supported by Legally Sufficient Evidence**

The Court of Appeals ruled on Petitioner's direct appeal that his claim that his aggravated animal cruelty conviction was not supported by legally sufficient evidence was unpreserved. *People v. Augustine*, 969 N.Y.S.2d at 850. Based on that finding the Court concludes that federal review of Petitioner's sufficiency of the evidence claim is procedurally barred.

The Supreme Court has made it clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for default and prejudice attributed thereto, or demonstrate that failure to consider the

federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations and internal quotation marks omitted).  A fundamental miscarriage of justice has been construed as a finding of actual innocence.  *House v. Bell*, 547 U.S. 518, 536-39 (2006). Preclusion of federal review under the adequate and independent doctrine requires that the last state court to render judgment "must clearly and expressly state . . . that its judgment rest[ed] on a state procedural bar." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (citation omitted).  The Court of Appeals clearly and expressly found that Petitioner's legal sufficiency of the evidence claim was unpreserved.  *People v. Augustine*, 969 N.Y.S.2d at 850.

New York's contemporaneous objection rule requires a party to object to what he believes is legal error in a trial court's ruling at any subsequent time when the court had the opportunity of effectively changing the same.  (N.Y. Criminal Procedure Law § 470.05(2).  Where a party fails to lodge a contemporaneous objection, the issue is unpreserved for trial because of the party's procedural default. *Guttierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012).  Under New York law, in order to properly preserve a challenge to the legal sufficiency of the evidence, "a defendant must move for a trial order of dismissal and the motion must be 'specifically directed' to the error regarding the evidence being urged by the defendant." *People v. Hawkins*, 872 N.Y.S.2d 395, 399 (2008).  In this case, Petitioner did not move for a trial order of dismissal either at the end of the People's case or at the close of evidence.  (Dkt. No. 11-4 at 128, 146.)

Based upon the foregoing, the Court finds that Petitioner's legal sufficiency of the evidence claim with regard to the aggravated cruelty to animals conviction is procedurally barred, and recommends that the claim be denied on that ground.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDE**D that no certificate of appealability be issued with respect to any claims set forth in the petition as Petitioner has not made "a substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2); and it is hereby

**ORDERED**, that the Clerk's Office provide Petitioner with copies of this Order and Report-Recommendation and all unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: May 16, 2017
          Syracuse, New York

*[signature]*

Therese Wiley Dancks
United States Magistrate Judge

---

[8]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2009 WL 3837304
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Rahmell DANIEL, Petitioner,
v.
James J. WALSH, Superintendent, Respondent.

No. 08–CV–2864 (JFB).
|
Nov. 17, 2009.

**Attorneys and Law Firms**

Rahmell Daniel, Fallsburg, NY, pro se.

Andrew Fukuda, Douglas R. Noll Mineola, NY, for Respondent.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** Rahmell Daniel (hereinafter, "Daniel" or "petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. On March 7, 2005, following a jury trial in the County Court of the State of New York, Nassau County, petitioner was convicted of manslaughter in the first degree as a lesser-included offense of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. Petitioner was sentenced to concurrent determinate terms of imprisonment of twenty-five years with five years of post-release supervision, fifteen years with five years of post-release supervision, and seven years with three years of post-release supervision, respectively, as well as restitution in the amount of $6,449.00.

On appeal, the New York Appellate Division, Second Department, held that the trial court erred in refusing to charge manslaughter in the second degree as a lesser-included offense of intentional murder and, therefore, vacated the manslaughter conviction. The Second Department, however, concluded that the remaining convictions, *i.e.,* the criminal possession of a weapon in the second degree and third degree, as well as the sentences imposed thereon, were proper and affirmed

those convictions. The New York Court of Appeals denied leave to appeal.

Petitioner challenges his remaining convictions in this habeas petition on the following grounds: (1) the criminal possession of a weapon in the second degree charge should have been vacated when the Appellate Division vacated the manslaughter charge because manslaughter was the factual predicate establishing intent for the weapons charge; (2) the trial court failed to suppress petitioner's pre-trial statements obtained through *Miranda* violations because the petitioner's youth and limited intelligence, in the absence of a parent, rendered his waiver of *Miranda* rights ineffective; and (3) the trial court deprived petitioner of a fair trial by (a) stating that the jury's case was "easier" because the death penalty did not apply and (b) incorrectly invoking the collateral evidence rule to refuse to admit evidence proffered by the defense to show that a major prosecution witness, James Schumeyer, testified falsely regarding a material issue.

For the reasons set forth below, the Court finds that petitioner's first claim—namely, that the weapons charge must be vacated because it was a factual predicate for the manslaughter charge—is procedurally barred from review and, in any event, all of the claims (including the first claim) fail on the merits. Accordingly, Daniel's petition for a writ of habeas corpus is denied in its entirety.

## I. BACKGROUND

### A. The Underlying Facts

Based upon a review of the petition and underlying record, the Court has set forth below a summary of the evidence presented at petitioner's trial.

#### 1. Evidence Presented By Prosecution

**\*2** After school on October 22, 2002, petitioner went to his girlfriend's house in Brentwood with his friend, Stephen Rice. (Tr. 865.) Petitioner gave Rice petitioner's gun to hold, which Rice put in his jacket pocket. (Tr. 865–68, 898–99, 1032–33.) Later in the evening, Rice and petitioner left the girlfriend's home and took a train to Farmingdale. (Tr. 868–70.) Upon arriving, they waited at

the station parking lot for a friend to pick them up. (Tr. 871.)

Meanwhile, Raul Alvarenga, Edwin Machado, Krystal Douglas, and Yeny Gomez Diaz met at the Farmingdale train station to celebrate Alvarenga's birthday. (Tr. 495, 496.) James Schumeyer, another friend, also joined the group along with three of Alvarenga's other friends and relatives. (Tr. 498.)

While the group was talking, Alvarenga heard petitioner say, "a white boy with a nice truck." (Tr. 499.) Alvarenga turned around to find petitioner and Rice. (Tr. 501.) He exchanged angry words with petitioner, and Schumeyer then got in his Ford Explorer with the three people who arrived with him. (Tr. 501–02.) Before he drove away, Schumeyer warned petitioner, "You better not be here when I get back." (Tr. 502.)

At this point, petitioner asked for the gun back from Rice. (Tr. 879.) When Machado continued the argument, petitioner pulled the gun out. (Tr. 503–04.) Machado got upset and said, "If you're going to kill me you're going to kill everybody that is here with me. (Tr. 505.) Taking off his sweater and jacket, Machado stood bare-chested before petitioner and put out his hands. (Tr. 505.) Schumeyer testified that, while he had not been present during this argument, Alvarenga had told him that Machado had used racially offensive terms such as "chocolate." (Tr. 657.) Others testified that petitioner began taunting Machado, asking him if he was afraid to die and calling him names. (Tr. 956, 958.) As Machado walked toward him, petitioner pulled the trigger and shot Machado in the chest. (Tr. 507.)

Two days later, petitioner was arrested by Detective John McHugh. Three days later, Rice was arrested by Detective Lesmeister. [1] In due course, Rice entered into an agreement with the prosecution that, in return for his testimony at petitioner's trial, he would plead guilty to misdemeanor weapons possession and be sentenced to probation. (Tr. 888–98, 919.)

After being arrested, petitioner was questioned by Detective Lesmeister and Detective Parpan in an interview room. (Tr. 676–80.) Detective Lesmeister issued *Miranda* warnings to petitioner, who indicated that he understood his rights and responded to questioning. (Tr. 681–85.) At first, petitioner denied any part in the shooting. However,

when Detective Parpan told petitioner that petitioner's girlfriend had already told Detective Parpan "everything," petitioner changed his statement. (Tr. 686–87.) He stated that he had hidden the gun in a yard on Hudson Street in Farmingdale. (Tr. 694.) After finding this out, Sergeant Lesmeister and Detective Parpan drove petitioner to Farmingdale, where petitioner led the two detectives to the firearm. (Tr. 693–701.)

**\*3** They returned to the Homicide Squad office, and petitioner agreed to provide a written statement. (Tr. 702–04.) Sergeant Lesmeister began writing down petitioner's statement, which was read and signed by petitioner. (Tr. 713–14.) Petitioner also made a videotaped statement to the Assistant District Attorney. (Tr. 721–22.) At trial, petitioner testified that he was seventeen years old on the day of the shooting. The parties also stipulated that petitioner had an IQ of about eighty and that his reading ability was at the fifth grade level at the time of his arrest. (Tr. 1207.)

2. Evidence Presented by Defense

Petitioner testified at the trial and a summary of his testimony is set forth below.

According to petitioner, while in the parking lot at Farmingdale train station, petitioner noticed a truck pull up and join the group that had gathered earlier. Petitioner saw the group give each other hand signals that he recognized to be gang related, specifically of the Hispanic gang known as MS–13. (Tr. 1034–37, 1144–45.) This caused petitioner great distress. (Tr. 1037–39, 1146–48.)

While petitioner and Rice looked at the truck, its driver challenged them. Petitioner and the driver of the truck, exchanged insults, and, according to Rice's testimony, before driving off, the driver threatened that they would be returning with guns. (Tr. 875–76.)

Petitioner then asked Machado what was wrong and why the driver was leaving to get a gun. Machado responded, "shut up black n*****, you talk too much." Petitioner tried to mollify Machado, who responded with further invective. (Tr. 1039–40, 1147–49.) Machado then challenged petitioner to a fight. (Tr. 1040.) Rice handed petitioner the gun that petitioner had asked him to hold, which petitioner displayed to Machado to try to get

Daniel v. Walsh, Not Reported in F.Supp.2d (2009)
Case 9:14-cv-01230-MAD-TWD    Document 21    Filed 05/17/17    Page 38 of 69
2009 WL 3837304

Machado to retreat. (Tr. 1040–41, 1139, 1146.) Petitioner claims that he had a gun because he had been robbed at the Farmingdale Long Island Railroad train station before and felt he needed to be armed for his protection. (Tr. 1027–32, 1126–31.)

Machado began to take off his clothes while saying, "Come on. I ain't afraid of you, I ain't afraid to die.... You can shoot me, I don't care. If you shoot me, you got to shoot everybody here." Petitioner told Machado to relax, but Machado kept coming closer as petitioner was backing up. (Tr. 1044–45.) When petitioner saw Machado make a movement toward a bulge in Machado's waist area, petitioner thought Machado was reaching for a gun. (Tr. 1045–46.) At that point "the gun went off." (Tr. 1045.) Machado fell to the ground, and petitioner fled the scene with Rice. (Tr. 941.)

Petitioner was scared and nervous after the gun went off, and when Rice began to run, petitioner followed him. (Tr. 1048–49.) Rice noticed petitioner was still holding the gun and told him to throw it away. (Tr. 1049–50.)

Several days later, petitioner was arrested. Upon arriving at the Nassau County Police Headquarters, petitioner asked the police to contact his mother. According to petitioner, he was told that he would not be allowed to contact his mother until he made a complete statement as to what happened to Machado. Petitioner was promised that, if he gave such a statement, he would be permitted to go home. (Tr. 1057–62, 1068–72, 1074.) Petitioner helped the police locate the gun that he had buried. (Tr. 1064.) Petitioner was then brought back to the station, where he signed a statement that was written by Detective Lesmeister. (Tr. 1066–68.) With respect to the videotaped statement, petitioner claimed that it was not the truth; rather, he was simply following the directions of Detective Lesmeister. (Tr. 1072.)

### B. Procedural History

**\*4** Prior to trial, petitioner had a full hearing to contest the admissibility of his statements and the physical evidence that was seized. The court issued a written decision that denied petitioner's suppression motion. The hearing court found that there was probable cause for petitioner's arrest and that he voluntarily, knowingly,

and intelligently waived his constitutional rights before speaking to the police.

At trial, petitioner was convicted of manslaughter in the first degree (N.Y. Penal Law § 125.20[1] ) as a lesser-included offense of murder in the second degree, criminal possession of a weapon in the second-degree (N.Y. Penal Law § 265.03), and criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02). On March 7, 2005, petitioner was sentenced to concurrent determinate terms of twenty-five years' imprisonment, with five years of post-release supervision for the manslaughter conviction, and for the weapons charges, the court imposed concurrent determinate terms of fifteen years' incarceration with five years of post-release supervision, and seven years' incarceration with three years of post-release supervision. Petitioner was also order to pay restitution totaling $6,449.00.

On March 7, 2006, with the assistance of counsel, petitioner appealed his conviction to the New York Appellate Division, Second Department (hereinafter, "Appellate Division"). In his brief submitted to the court, petitioner contended that: (1) the trial court erred when it denied his request for a jury instruction to consider the lesser-included offenses of second-degree manslaughter and criminally negligent homicide; (2) the trial court erred when it denied petitioner's motion to suppress oral, written, and videotaped confessions despite petitioner's ineffective waiver of his Fifth Amendment rights; (3) the trial court judge denied petitioner a fair trial (a) by stating that the jury's case was "easy" because the death penalty did not apply, and (b) by incorrectly invoking the collateral evidence rule to preclude impeachment of prosecution witness James Schumeyer as to whether Schumeyer had heard the decedent direct racial epithets toward petitioner shortly before the gun was shot; and (4) the sentence imposed by the trial court was unduly harsh and excessive. On February 20, 2007, the Appellate Division found that the trial court had erred in refusing to charge manslaughter in the second degree as a lesser-included offense of intentional murder. Accordingly, the state appellate court vacated petitioner's conviction for manslaughter in the first degree. The Appellate Division determined that it need not reach the issue regarding the impeachment of Schumeyer's testimony because the manslaughter conviction was vacated and denied petitioner's remaining claims. *People v. Daniel,* 37 A.D.3d 731, 830 N.Y.S.2d 319 (App.Div.2007). Petitioner

Case 9:14-cv-01230-MAD-TWD    Document 21    Filed 05/17/17    Page 39 of 69

filed leave to appeal to the New York Court of Appeals on his remaining grounds for appeal. On July 3, 2007, the Court of Appeals denied petitioner leave to appeal from the Appellate Division's order. *People v. Daniel,* 9 N.Y.3d 864, 864, 840 N.Y.S.2d 893, 872 N.E.2d 1199 (2007).

## C. The Instant Petition

**\*5** On July 14, 2008, petitioner filed the instant petition before this Court. Petitioner's first claim contends that his criminal possession of a weapon in the second degree conviction should have been vacated by the Appellate Division because that charge was factually connected to the second-degree murder charge of which he was acquitted and the first-degree manslaughter charge that was vacated, and because there was no evidence at trial that established that he intended to use the gun unlawfully against another. Petitioner also raises the second and third claims that he had submitted on direct appeal to the Appellate Division. This Court issued an Order to Show Cause on July 18, 2008. A response in opposition was filed on September 19, 2008. Petitioner moved for the appointment of counsel on October 14, 2008. The Court denied petitioner's motion on October 20, 2008. This matter is fully submitted.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Williams,* 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* at 93 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.'*" *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir.2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)).

## III. DISCUSSION

### A. Procedural Issues

#### 1. Failure to Exhaust

**\*6** As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida,* 549 U.S. 327, 333, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007), petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Daye v. Attorney Gen. of N.Y.,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (quotation marks omitted) (alteration in original)).

However, "it is not sufficient merely that the federal habeas applicant has been through the state courts." *Picard,* 404 U.S. at 275–76. On the contrary, to provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see also Duncan,* 513 U.S. at 365–66. "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.' " *Jones v. Keane,* 329 F.3d 290, 294–95 (2d Cir.2003) (quoting *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (quoting *Daye,* 696 F.2d at 191)). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye,* 696 F.2d at 191–92 (citing *Picard,* 404 U.S. at 276; *United States ex rel. Cleveland v. Casscles,* 479 F.2d 15, 19–20 (2d Cir.1973)). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye,* 696 F.2d at 192 (footnote omitted).

### 2. State Procedural Requirements

Like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements deprives the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson,* 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Reyes v. Keane,* 118 F.3d 136, 140 (2d Cir.1997) (quoting *Coleman,* 501 U.S. at 735) (additional citations and emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are ... to be deemed exhausted." *DiGuglielmo v. Smith,* 366 F.3d 130, 135 (2d Cir.2004) (citing *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991)). Therefore, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Keane,* 118 F.3d at 139 (quoting *Hoke,* 933 F.2d at 120 (quoting *Harris,* 489 U.S. at 263 n. 9)).

**\*7** However, "exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (citing *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Coleman,* 501 U.S. at 744–51). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Netherland,* 518 U.S. at 162 (citations omitted).

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect that state judgments must be accorded. *See House v. Bell,*

547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). Petitioner's federal claims may be procedurally barred from habeas corpus review if they were decided at the state level on adequate and independent procedural grounds. *See Coleman,* 501 U.S. at 729–33. The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Id.* at 730–31.

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Coleman,* 501 U.S. at 750 (citations omitted). A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

### 3. Application

As a threshold matter, respondent argues that petitioner's first claim in the instant petition, contending that the criminal possession of a weapon in the second degree charge should have been vacated, is procedurally barred and that petitioner has failed to demonstrate any grounds to overcome this procedural bar. The Court agrees.

Petitioner has not demonstrated that he presented his first claim to the Appellate Division on direct appeal. On direct appeal, petitioner did not raise any claim that there was a lack of proof as to his intent to use the weapon. Nor did petitioner argue that vacatur of his manslaughter conviction would require vacating the second-degree weapon possession conviction. Petitioner thus failed to raise this claim on direct appeal and, as discussed below, there is now no procedural mechanism for petitioner to bring this claim before any state court.[2] However, because petitioner no longer has any further remedies available to him in the New York State courts with respect to this claim, he meets the technical requirements for exhaustion. *Coleman,* 501 U.S. at 732. Thus, the claim is deemed exhausted under 28 U.S.C. § 2254(b).

**\*8** Nonetheless, petitioner's first claim is procedurally barred. Where " 'the petitioner failed to exhaust state

remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." *Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir.2001) (quoting *Coleman,* 501 U.S. at 735 n. 1). In New York, a defendant may not collaterally attack a conviction based on a claim that he could have raised on direct appeal where he unjustifiably failed to raise it. N.Y.Crim. Proc. Law § 440.10(2)(c); *see, e.g., Sweet v. Bennett,* 353 F.3d 135, 140 (2d Cir.2003). Petitioner's inability to return to state court provides an independent and adequate state ground upon which his claim is procedurally defaulted.

Furthermore, petitioner has not shown cause for, or prejudice resulting from, the default. Here, petitioner did not make any attempt to explain his failure to raise the claim in a timely manner, nor has he demonstrated that a fundamental miscarriage of justice would occur if these claims were not reviewed by the habeas court. Not only is petitioner's application devoid of any claim of actual innocence, but the evidence presented at trial established petitioner's guilt beyond a reasonable doubt. Accordingly, petitioner has failed to present any circumstances to overcome the procedural bar that renders his claims exhausted but procedurally defaulted.

In any event, in an abundance of caution, the Court has analyzed the merits of the procedurally barred claim (along with all other claims) and concludes that none of the claims provides a basis for granting habeas relief in this case on the merits.

### B. The Merits

#### 1. Claim Regarding Manslaughter As Factual Predicate to Intent for Second–Degree Criminal Possession of a Weapon

Petitioner argues that his conviction for criminal possession of a weapon in the second degree should have been vacated when the Appellate Division vacated the manslaughter in the first degree conviction because "manslaughter was the factual predicate establishing intent." (Daniel's Petition ("Pet.") at 5.) Petitioner's claim fails on the merits.

First, as respondent correctly notes, the second-degree weapon-possession statute at the time of petitioner's crime provided: "A person is guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another [he] possesses a loaded firearm." N.Y. Penal Law § 265.03(2) (2002). The law does not make homicide a predicate to finding criminal possession of a weapon. Individuals may be charged with and convicted of criminal possession of a weapon in the second degree without any accompanying or predicate homicide charge. *See, e.g., People v. Torres,* 32 A.D.3d 796, 821 N.Y.S.2d 206, 206–07 (App.Div.2006); *People v. Clanton,* 19 A.D.3d 1035, 796 N.Y.S.2d 795, 796 (App.Div.2005) (finding that the jury did not reach an "inherently self-contradictory verdict" when defendant "was acquitted of robbery in the first degree, but convicted of criminal possession of a weapon in the second degree").

**\*9** There was also sufficient proof of petitioner's intent to possess the weapon. Intent, like any other "mens rea ... will usually depend upon reasonable inferences from those objective facts" presented at trial. *United States v. Bailey,* 444 U.S. 394, 417, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). In this case, petitioner shot fifteen-year-old Machado in the chest. Petitioner also taunted Machado by stating, "You think I won't shoot?" and calling him names (Tr. 528, 879–80, 882), which further indicated his intent to use the gun. Indeed, at trial during petitioner's summation, petitioner's counsel conceded that the jury could "convict him of" the criminal possession charges in lieu of a homicide conviction. (T. 1260–61.)

Accordingly, at trial, there was sufficient evidence concerning the gun count to establish intent. The petitioner's claim that he lacked the requisite intent to be convicted of criminal possession of a weapon in the second degree is without merit and does not provide a basis for habeas relief.

## 2. Self–Incrimination Claim

Petitioner further claims that his pre-trial motion to suppress statements should have been granted because his waiver of his *Miranda* rights was involuntary. Specifically, petitioner argues that his waiver of his *Miranda* rights, in the absence of a parent, was ineffective because of his youth and limited intelligence. As set forth below, the Court concludes that this claim also lacks merit.

### a. Legal Standard

For a petitioner to prevail on his *Miranda* claim, he must demonstrate that the trial court's denial of his motion to suppress his post-arrest statement was either (1) contrary to, or an unreasonable application of, clearly established federal law, or (2) was based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). In the instant case, as set forth below, the factual findings of the New York courts are presumed to be correct because they were made after extensive development of the material facts and were supported by the record. In short, petitioner has not demonstrated that there were any unreasonable factual findings; rather, having reviewed the record, this Court concludes that the denial of the suppression motion was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court also finds the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established law.

Furthermore, the *Brecht* standard of harmless error review applies regardless of whether petitioner's rights were violated due to *Miranda* violations or physical coercion. The more stringent *Brecht* standard, applicable to collateral review of state court error, asks "whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict[.]' " *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)), and shifts the burden of proof from the state to the petitioner. *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht,* 507 U.S. at 637 (citing *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). Thus, "[h]abeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict." *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994) (citing *Brecht,* 507 U.S. at 637). Thus, even assuming *arguendo* that petitioner's constitutional rights had been violated, under the *Brecht* standard of review, petitioner's claim warrants no relief.

**\*10** The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir.1997) (citing *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)); *see also Mincey v. Arizona,* 437 U.S. 385, 396, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (holding that the Court is not bound by a state court's determination that a statement was voluntary; "[i]nstead, this Court is under a duty to make an independent evaluation of the record"). Factual questions underlying a legal determination are entitled to a presumption of correctness under 28 U.S.C. § 2254(d); *Nelson,* 121 F.3d at 833–34. Specifically, this Court is required to give deference to the state court's factual determinations, and petitioner bears the burden of rebutting those determinations by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001) (holding that under AEDPA, " 'a determination of a factual issue made by a State court shall be presumed to be correct[, and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence" (quoting 28 U.S.C. § 2254(e)(1))). However, the Second Circuit has noted that the "statutory presumption refers to historical facts, that is, recitals of external events and the credibility of the witnesses narrating them." *Nelson,* 121 F.3d at 833 (citation and internal quotation omitted). Thus, "[i]f the material facts were not adequately developed at the State court hearing or the District Court finds that the factual determination is not fairly supported by the record, the presumption of correctness is set aside." *Id.* (citation and internal quotation omitted). When evaluating the voluntariness of a confession, no one factor is determinative; rather, the totality of the circumstances must be evaluated. *Green v. Scully,* 850 F.2d 894, 901 (2d Cir.1988). The factors to be considered include (1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials. *Id.* at 901–02.

b. Application

Petitioner claims that, under the totality of the circumstances, his waiver of *Miranda* rights was invalid because he was sixteen years old with a stipulated IQ of 80 and he did not have a parent present. As set forth below, the Court finds these arguments to be without merit. As a threshold matter, with respect to his age,

petitioner's allegation that he was sixteen years old during the interrogation is contrary to his own testimony at trial. Petitioner testified at trial that he was seventeen years old on the day of incident. (Tr. 1025.) *See, e.g., Bridges v. Chambers,* 447 F.3d 994, 998 (7th Cir.2006) ("All of these sources [cited by petitioner] are unpersuasive for the same reason: None involve Supreme Court precedent that clearly established that 17–year–olds must be considered juveniles.") In any event, even assuming *arguendo* that petitioner was sixteen at the time of his arrest, age is only one factor in assessing voluntariness; a waiver is not automatically invalidated because of age. *See Fare v. Michael C.,* 442 U.S. 707, 725–26, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (finding confession admissible because sixteen year old validly waived constitutional rights); *Nova v. Bartlett,* 211 F.3d 705, 708 (2d Cir.2000) (finding statements made by "a teenager without a high school diploma who had little experience with the law" voluntary); *United States v. Bourrous,* 147 F.3d 111, 116 (2d Cir.1998) (holding sixteen year old's confession voluntary and admissible); *Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir.1989) (finding waiver of *Miranda* rights by young individual with poor grasp of English language voluntary when questioning by police was not coercive or overbearing). Instead, the voluntariness of the confession is examined under the totality of the circumstances. *See, e.g., Bridges,* 447 F.3d at 997 ("Essentially, [petitioner] argues his supposed juvenile status entitles him to an evidentiary presumption where none exists. 'This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved.' " (quoting *Fare v. Michael C.,* 442 U.S. at 725)).

**\*11** Petitioner also argues that, because he was sixteen years old at the time of the interrogation, his parents should have been notified of his arrest. As noted above, petitioner himself acknowledged at trial that he was seventeen at the time of his arrest. New York's parental notification statute was not applicable to petitioner, whether he was sixteen or seventeen at the time of his arrest, because that statute is only applicable to children *under* sixteen. N.Y. Family Court Act § 305.2; *see In re Manuel B.,* 4 Misc.3d 722, 781 N.Y.S.2d 595, 597–98 (Fam.Ct.2004). In any event, even assuming *arguendo* that parental notification was required under state law or the federal Juvenile Delinquency Act, 18 U.S.C. § 5033, the absence of a parent does not automatically invalidate a waiver of *Miranda* rights because, as with age, it is just

one factor to be taken into account in determining the voluntariness of a confession. *See Fare v. Michael C.,* 442 U.S. at 725; *Burrous,* 147 F.3d at 115–16; *United States v. Doe,* 170 F.3d 1162, 1166–68 (9th Cir.1999) (holding that lack of parental notification is not a per se due process violation that warrants voiding a juvenile's *Miranda* waiver). Accordingly, petitioner's age and the absence of parental notification prior to his questioning do not, by themselves, establish a basis for habeas relief; rather, the court examines the totality of the circumstances. *See, e.g., Gilbert v. Merchant,* 488 F.3d 780, 793 (7th Cir.2007) ("[T]he absence of a parent is not dispositive; it is the totality of the circumstances underlying a juvenile confession, rather than the presence or absence of a single circumstance, that determines whether or not the confession should be deemed voluntary.").

The analysis is the same with respect to plaintiff's intellectual ability. [3] Petitioner claims that, due to his low IQ, he was unable to knowingly waive his rights. However, low IQ by itself does not render the waiver involuntary. Instead, for a waiver of *Miranda* rights to be deemed involuntary, an individual must be "so incompetent that he was not aware 'both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " *United States v. Male Juvenile (95–CR–1074),* 121 F.3d 34, 40 (2d Cir.1997) (quoting *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) and citing *Toste v. Lopes,* 701 F.Supp. 306, 313–14 (D.Conn.1987) aff'd, 861 F.2d 782, 783 (2d Cir.1988) (per curiam) (although psychological testimony indicated that petitioner was 'mildly retarded' and of 'dull normal intelligence,' the evidence did not show an inability to knowingly waive his rights")); *see also Clark v. Mitchell,* 425 F.3d 270, 283–84 (6th Cir.2005) ("[Borderline retardation ... or 'low average intellect' ... is not dispositive" of the voluntariness of a defendant's waiver of his constitutional rights; *People v. Williams,* 62 N.Y.2d 285, 287, 476 N.Y.S.2d 788, 465 N.E.2d 327 (1984) (a borderline mentally retarded man was capable of waiving his constitutional rights).

**\*12** Here, there is more than sufficient evidence to support the state court's determination, under the totality of the circumstances, that petitioner voluntarily made incriminating statements after being advised of his *Miranda* rights. In particular, the following evidence from the suppression hearing, *inter alia,* regarding the circumstances of the questioning supports the

reasonableness of that determination: (1) petitioner arrived at the police station around 3:20 p.m. (H.22, 84); (2) he immediately was given a soda and sat unhandcuffed for some period of time (H.21–23, 84); (3) he orally waived his *Miranda* rights and also indicated his waiver by writing the word "yes" on the *Miranda* card, and then initialing and signing the card (H.23–27); (4) at about 5:25 p.m., petitioner left the stationhouse with several police officers in order to retrieve the gun he had hidden following the shooting and, after locating the gun, returned to the police station where he had pizza and soda, and again waived his *Miranda* rights and signed a *Miranda* card (H.39–42); (5) even though petitioner did not request to telephone his mother or anyone else, he telephoned his mother at 9:30 p.m. at a detective's suggestion and told her to cooperate with the police in retrieving his cell phone (H.50–51); (6) with respect to the videotaped confession, petitioner arrived at the District Attorney's office around 10:30 p.m. (H.51–54); (7) he was interviewed on videotape until 11:30 p.m. and, during such interview, petitioner was never promised anything, never asked for an attorney, and never indicated that he did not wish to speak with the police (H.53–61). Moreover, there was no suggestion of physical abuse or coercion of any kind. In addition, with respect to his intellectual capacity, it was established at the suppression hearing, *inter alia,* that he attended school, was able to read and write, could recall his address, as well as his social security and telephone numbers. (H.27–28.) He was able to think quickly enough to hide the weapon. (H.16, 41.) Based upon all of the evidence, there was certainly sufficient evidence to refute the claim that petitioner's IQ was low enough to invalidate his waiver. In short, there is no basis to disturb the state court's finding after a full hearing, that petitioner was properly given the *Miranda* warnings, and his waiver was voluntary. Any evidence derived as a result of petitioner's confession was also correctly admitted into evidence because "derivative evidence may be excluded as tainted only when the court has actually found a prior constitutional violation." *Bruno v. Cunningham,* No. 03 Civ. 937(MBM), 2004 WL 2290503, at \*12 (S.D.N.Y. Oct.8, 2004) (citing *Oregon v. Elstad,* 470 U.S. 298, 308, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

In sum, after an extensive review of the record, the Court concludes that the trial court's determination of petitioner's *Miranda* claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination

of the facts in light of the evidence presented. The totality of the circumstances surrounding petitioner's waiver does not suggest that his waiver was involuntary. Furthermore, any *Miranda* violation would be harmless error under the applicable *Brecht* standard due to the overwhelming evidence of petitioner's guilt. Apart from the confession, there were five witnesses who identified him as the person who used the gun to shoot Machado.

**\*13** Accordingly, the *Miranda* claim fails on the merits and does not provide a basis for habeas relief.

### 3. Fair Trial Claim

Petitioner argues that he was deprived of a fair trial: (1) when the trial judge told the jury that the death penalty was not an option in the instant case and that this knowledge "might make this very hard job that we all have just the slightest easier" (Tr. 103); and (2) when the trial court precluded the introduction of testimonial evidence to impeach a witness. Both of these claims fail on the merits.

### 1. Judicial Intervention/ Bias Claim

Petitioner claims that the trial judge's biased treatment of defense counsel before the jury deprived petitioner of his fundamental right to a fair trial. Specifically, petitioner alleges that the court created bias against the defense when it stated that the jury's case was made "easier" because the death penalty didnot apply to this case. Petitioner argues that this statement made it appear that the petitioner was already presumed to be guilty. As set forth below, the Court finds this claim to be without merit.

Petitioner appears to argue both excessive judicial intervention and judicial bias as bases for this due process claim. Under the federal habeas review, a petitioner faces a high hurdle in demonstrating he was constitutionally deprived of a fair trial because of biased treatment by a state trial judge. Although "prejudicial intervention by a trial judge could so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause," *Daye v. Attorney General,* 712 F.2d 1566, 1570 (2d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984), "a federal [habeas] court will not lightly intervene when such a claim is asserted." *Gayle*

*v. Scully,* 779 F.2d 802, 806 (2d Cir.1985). The "trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either [1] impaired functioning of the jury or [2] lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." *Daye,* 712 F.2d at 1572. In determining either, both the quantity and significance of the statements ought to be weighed. *Id.* (referring to the "quantity and nature of the trial judge's questioning").

The Second Circuit has acknowledged that the standard for determining when exactly a state judge engages in impermissible intervention is " 'somewhat ill-defined.' " *Gayle,* 779 F.2d at 806 (quoting *Johnson v. Scully,* 727 F.2d 222, 226 (2d Cir.1984)). However, case law regarding review of judicial intervention claims in federal criminal trials provides useful guidance here. In reviewing a federal judge's conduct, the Second Circuit has made clear that the behavior must be "so prejudicial that it denied [petitioner] a fair, as distinguished from a perfect, trial." *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). The issue is not one of "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985). "The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether 'it appeared clear to the jury that the court believed the accused is guilty.' " *United States v. Amiel,* 95 F.3d 135, 146 (2d Cir.1996) (quoting *United States v. Nazzaro,* 472 F.2d 302, 303 (2d Cir.1973)).

**\*14** In conducting its review, a court "must make 'an examination of the entire record,' in order to determine whether the defendant received a fair trial." *United States v. Mickens,* 926 F.2d 1323, 1327 (2d Cir.1991) (quoting *United States v. Bejasa,* 904 F.2d 137, 141 (2d Cir.1990)). It would be improper for the judge's statements to be "judged in isolation from the totality of the record through the dispassionate looking glass of hindsight...." *Bejasa,* 904 F.2d at 141. By placing the individual statements in the context of the entire record, certain factors may be found to have mitigated their prejudicial effect. *See Martinez v. Kelly,* No. 01 Civ. 11570, 2005 U.S. Dist. LEXIS 42952, at \*17, 2005 WL 1863854 (S.D.N.Y. Aug. 4, 2005). For example, "a trial court's negative comments to or about

defense counsel are typically not viewed as compromising the fairness of a trial where they were *provoked* by defense counsel himself." *Id.* (emphasis added); *see also Mickens,* 926 F.2d at 1327. "In addition, the prejudicial effect of a trial court's comments 'can be cured by the court's cautionary instruction' to the jury." *Martinez,* 2005 U.S. Dist. LEXIS 42952, at *17, 2005 WL 1863854 (quoting *Mickens,* 926 F.2d at 1327–28). In sum, the reviewing court should embark on a holistic evaluation "requir[ing] a close scrutiny of each tile in the mosaic of the trial so that [it] can determine whether instances of improper behavior or bias, when considered individually or taken together as a whole, may have reached the point where [it] can make a safe judgment that the defendant was deprived of the fair trial to which he is entitled." *Nazzaro,* 472 F.2d at 304.

In the instant case, this Court concludes that the state court correctly determined that the comments "although better left unsaid, did not, under the circumstances of this case, deprive the defendant of a fair trial." *Daniel,* 830 N.Y.S.2d at 321. As set forth below, this isolated statement by the trial judge did not convey a partiality to the jury that would have factored into its determination of petitioner's guilt, nor did it express a bias that undermined the appearance of a fair trial.

As a threshold matter, it is important to analyze the context of the statement. The trial judge's statement, of which petitioner complains, was prompted by certain statements by defense counsel. In particular, during jury selection, defense counsel stated that petitioner's "life is at stake" on two occasions. (Tr. 77, 94.) In order to promote accuracy and avoid jury confusion, the court told jurors that the court had

> omitted to tell [the potential jurors] something that might make this very hard job that we all have just the slightest [bit] easier, it might make you feel a little easier in your mind[,] and that is ... [t]his defendant, Mr. Daniel, does not face the death penalty. Does not face the death penalty. So that makes the job a little bit easier to do. I hope so.

**\*15** Because the defense counsel perhaps had given the jurors a misimpression that defendant might be facing

the death penalty, the court's remedial instruction was designed to correct a situation created by defense counsel.

In any event, the phrasing of the statement by the trial judge did not deprive petitioner of a fair trial. The instruction was given in the overall context of the trial court's repeated instructions that punishment was not a concern for the jury (Tr. 31, 1306); that punishment, "only in the event it becomes necessary," rests with the court alone (Tr. 1306); that the verdict was to be based on evidence and evidence alone, not sympathy, prejudice, or other illegitimate factors (Tr. 1306–07, 1312); and that the court held no views as to defendant's guilt or innocence, and that any such views would be irrelevant (Tr. 1307–08). In short, any error in the statement by the trial court did not deprive defendant of due process.

In addition, proof of the defendant's guilt was overwhelming. Not only did Daniel confess multiple times, but there were five witnesses who identified him as the person who shot Machado. Forensic evidence also proved that the final bullet came from the gun that petitioner hid. Thus, had the trial judge's interventions amounted to constitutional error, the violation would be subject to harmless error review under *Brecht.* Based on the overwhelming evidence of petitioner's guilt, the jury would have found petitioner guilty regardless of any improper judicial intervention.

In sum, this Court finds no basis to conclude that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the statement by the trial court during jury selection does not provide a basis for habeas relief under the circumstances of this case.

### 2. Claim Regarding Evidentiary Ruling

Petitioner also claims that the court improperly prohibited the defense from impeaching prosecution witness James Schumeyer by calling a defense investigator, Joseph DiBennidetto, to impeach certain statements made by Schumeyer during his testimony. At trial, Schumeyer denied hearing Machado call petitioner racial epithets. According to petitioner, DiBennidetto would have testified that Schumeyer told him that he had heard Machado or one of the other persons present make racial epithets directed toward petitioner.

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983); *see generally Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (citations omitted) ("[H]abeas corpus relief does not lie for errors of state law."). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must "show that the error deprived [him] of a fundamentally fair trial." *Taylor,* 708 F.2d at 891; *see also Zarvela v. Artuz,* 364 F.3d 415, 418 (2d Cir.2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.' ") (quoting *Rosario v. Kuhlman,* 839 F.2d 918, 925 (2d Cir.1988) (internal quotation marks omitted)).

*\*16* To constitute a denial of due process under this standard, erroneously admitted or omitted evidence must have been " 'sufficiently material to provide the basis for conviction or to remove [or create] a reasonable doubt that would have existed on the record without it.' " *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (quoting *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992) (internal quotation marks omitted)); *see also Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (holding that evidence must be "crucial, critical, highly significant") (internal quotation marks and citation omitted). Moreover, the court must review the erroneously admitted or omitted evidence " 'in light of the entire record before the jury.' " *Dunnigan,* 137 F.3d at 125 (quoting *Collins,* 755 F.2d at 19 (internal quotation marks omitted)). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Wade v. Mantello,* 333 F.3d 51, 58, 59 n. 7 (2d Cir.2003). As set forth below, the Court has reviewed petitioner's objection to the excluded evidence under this two-part test and concludes that the claim does not warrant habeas relief.

First, the trial court's decision to preclude the testimony of DiBennidetto under the collateral evidence rule was correct under New York law. The collateral evidence rule bars parties from "introduc[ing] extrinsic evidence on a collateral matter solely to impeach credibility." *People*

*v. Alvino,* 71 N.Y.2d 233, 247–48, 525 N.Y.S.2d 7, 519 N.E.2d 808 (1987) (citations omitted). However, "answers to questions that have a direct bearing on an issue in the trial do not come within the [collateral evidence rule].... 'Direct, in this context, means any evidence tending to prove the proponent's case on the merits or to disprove the opponent's, even though this direct evidence, if believed, might also contradict, undermine or discredit a witness.' " *Bell v. Ercole,* No. 05 CV 4532(ERK), 2008 WL 2484585, at \*24 (E.D.N.Y. June 20, 2008) (quoting Prince, Richardson on Evidence § 6–305 (Richard T. Farrell ed., 11th ed.1995) and citing *People v. Hudy,* 73 N.Y.2d 40, 56, 538 N.Y.S.2d 197, 535 N.E.2d 250 (1988)). "[E]vidence of a witness' bias must be competent to be admissible, and the trial court has broad discretion to curtail exploration of collateral matters." *Justice v. Hoke,* 90 F.3d 43, 48 (2d Cir.1996) (citing *People v. Hudy,* 73 N.Y.2d 40, 56, 538 N.Y.S.2d 197, 535 N.E.2d 250 (1988)). Here, the trial court correctly determined, in its broad discretion, that the proposed testimony was prohibited by the collateral evidence rule and was also irrelevant. (Tr. 976–77.)

Second, even assuming *arguendo* that the ruling was erroneous under New York law, it did not result in a denial of the constitutional right to a fundamentally fair trial, including petitioner's right to present a defense. To obtain relief on this ground, petitioner must demonstrate not merely that the trial court's evidentiary ruling was incorrect, but that " 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.' " *Justice,* 90 F.3d at 47 (quoting *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Evaluated in the context of the entire record below, the omitted testimony of DiBennidetto does not create a reasonable doubt that did not otherwise exist as to petitioner's guilt. The trial court excluded DiBennidetto's testimony on the peripheral issue of whether Schumeyer heard Machado used racial slurs or insults. Machado's statements toward petitioner, regardless of their nature, could not create any reasonable doubt as to whether or not petitioner shot Machado. Nor would DiBennidetto's testimony, if deemed credible by the jury, have provided petitioner with a defense for his use of deadly force. Accordingly, this proposed testimony on a collateral matter—namely, Schumeyer's acknowledgment that he overheard the victim's statement prior to the shooting—had no impact on petitioner's right to a fundamentally fair trial, including his constitutional right to present a defense.

**\*17** Finally, even assuming *arguendo* the ruling had some impact on the manslaughter conviction and was constitutionally erroneous, such error was harmless as it related to the remaining convictions. DiBennidetto's testimony regarding Schumeyer's statements would only have been potentially relevant to the manslaughter charges, and the Appellate Division vacated petitioner's manslaughter conviction. Thus, even if the trial court's refusal to permit the testimony of DiBennidetto on Schumeyer's statements were deemed an abuse of its broad discretion, the error was harmless under the applicable *Brecht* standard.

### III. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Petitioner has failed to point to any state court ruling that was contrary to, or an unreasonable application of, clearly established federal law, or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court has reviewed all of petitioner's claims and finds them to be without merit. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3837304

Footnotes

1    Detective Lesmeister was promoted to Sergeant prior to the court proceedings in this case.

2    Although petitioner's leave letter to the New York Court of Appeals can be characterized as raising petitioner's first claim, respondent correctly notes that raising a claim for the first time in an application for discretionary review does not constitute "fair presentation" of the claim for the purposes of exhaustion unless the court considers that claim. *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989); *Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000). The Court of Appeals did not consider petitioner's claim, but rather denied leave to appeal.

3    As an initial matter, the Court notes that petitioner failed to raise theX issue of IQ at the suppression hearing. In any event, such claim is without merit for the reasons discussed *infra*.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    13

2007 WL 2071742
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Matthew G. DLUHY, Petitioner,

v.

William P. MAZZUCA, Superintendent of
Fishkill Correctional Facility, Respondent.

No. 9:03-CV-1153.
|
July 17, 2007.

**Attorneys and Law Firms**

Matthew G. Dluhy, Warwick, NY, pro se.

Steven H. Schwartz, Esq., Asst. Attorney General, of
Counsel, Hon. Andrew M. Cuomo, Attorney General of
the State of New York, Albany, NY, for Respondent.

### DECISION and ORDER

DAVID N. HURD, United States District Judge.

 *1 Petitioner, Matthew G. Dluhy, brought this petition
for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254. By a report recommendation dated May 15,
2007, the Honorable Gustave J. DiBianco, United
States Magistrate Judge, recommended that the petition
be denied and dismissed. Petitioner has filed timely
objections.

Based upon a de novo determination of the report
and recommendation, including the portions to which
petitioner objected, the Report-Recommendation is
accepted and adopted in whole. *See* 28 U.S.C. 636(b)(1);
Rule 10, Rules Governing Section 2254 Cases.

Accordingly, it is

ORDERED that the petition is DENIED and
DISMISSED in its entirety.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GUSTAVE J. Di BIANCO, Magistrate Judge.

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rules N.D.N.Y. 72.3(c).

Petitioner brings this action for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, challenging a judgment
of conviction from the Ulster County Supreme Court.
Petitioner was convicted after a jury trial of Robbery,
Second Degree on November 10, 1999. On January 14,
2000, petitioner was sentenced to a determinate term of
eleven years of incarceration. The Appellate Division,
Third Department affirmed the conviction on November
21, 2001. *People v.. Dluhy,* 288 A.D.2d 693, 732 N.Y.S.2d
724 (3d Dept.2001). The New York Court of Appeals
denied leave to appeal on February 21, 2002. *People v.
Dluhy,* 97 N.Y.2d 728, 767 N.E.2d 158 (2002). Petitioner
filed a petition for a writ of certiorari in the United States
Supreme Court. On October 21, 2002, the Supreme Court
denied that petition. *Dluhy v. New York,* 537 U.S. 978, 123
S.Ct. 441 (2002). Petitioner filed this federal habeas action
after the Supreme Court's denial of certiorari. (Dkt. No.
1).

While this application for habeas corpus was pending,
petitioner returned to New York State court and filed a
motion to vacate pursuant to N.Y. CRIM. PROC. LAW
§ 440.10 "on the basis of newly discovered evidence."
Ulster County Supreme Court denied the motion on
March 17, 2004. *People v. Dluhy,* March 17, 2004, Ulster
County Court (J. Bruhn). The Appellate Division, Third
Department and the Court of Appeals denied motions
for leave to appeal in June and August 2004, respectively.
*People v. Dluhy* (Appellate Division, 3d Dept., June 8,
2004); *People v. Dluhy,* 3 N.Y.3d 673, 817 N.E.2d 829
(2004) (Petitioner's Exhibit A at Dkt. No. 10).

On November 12, 2004, petitioner moved to supplement
the pleadings in this action. (Dkt. No. 10). Respondent
filed a memorandum of law opposing the motion in
December 2004 (Dkt. No. 12), and petitioner filed a
"traverse" in January 2005 (Dkt. No. 14). This court
granted the motion to amend the pleadings on April 25,

2005. (Dkt. No. 15). The amended petition was filed on May 25, 2005. (Dkt. No. 16).

**\*2** Petitioner raises four grounds in support of his amended petition.

 1. The conviction was obtained by the "use of evidence [a statement] obtained pursuant to an unlawful arrest."

 2. The conviction was obtained by the use of a coerced and involuntary confession.

 3. The conviction was obtained by violating "his Fifth Amendment right."

 4. Petitioner's Sixth Amendment right to counsel was violated.

Respondent has filed an answer, a memorandum of law, and the pertinent state court records. (Dkt. No. 19). For the following reasons, this court will recommend denial of the petition.

## DISCUSSION

### 1. *Facts*

On November 28, 1998, the Deli Grocery at Route 44/55 ("44/55 Deli") in Marlboro, New York was robbed. The 44/55 Deli was equipped with video monitoring equipment that recorded the incident. The owner was in the stockroom when he realized that someone in the store had a gun. (Trial Transcript ("T.3"), included as Volume 3 in State Court Records, p. 60). When he came out of the stockroom, the owner saw an individual lying on the floor, holding a gun. (T.3, 60). [1] The owner testified that the suspect wore a mask, and that the suspect's face was not visible. (T. 3, 61). The only description that the proprietor could give was that the suspect appeared to be a white man, and that he had blue eyes. (T. 3, 62).

In the days after the robbery, the police received a tip from an informant that petitioner had been involved in the robbery. (Huntley Hearing Volume 1 ("H.1"), (included in State Records in two volumes), 97). *See also* Petitioner's Exhibit E at Dkt. No. 10. On December 4, 1998, police officers from the Lloyd, Marlboro, and Poughkeepsie Police Departments apprehended petitioner at a residence in Poughkeepsie. Accounts vary regarding what occurred at the Poughkeepsie residence,

the circumstances surrounding petitioner's transport to the police station, and statements made at the police station.

Petitioner claims that no consent was given for police to enter the premises, and that he was removed from the premises handcuffed, without shoes, and shirtless. (Dkt. No. 16, 18-19). He claims that his statements at the police station were coerced and involuntary. (Dkt. No. 16, 18-19). Petitioner's trial counsel moved to suppress petitioner's statements, and the trial court held a *Huntley* [2] hearing to resolve the question of whether the statements were admissible. (H.1, 3-4).

After the *Huntley* hearing, the trial judge read his findings into the record. (H.2, 145). The trial court found that the police officers entered the Poughkeepsie residence with the permission of the owner and a resident of the first floor apartment. (H.2, 146). Police officers searched for and found petitioner in the basement of the residence. (H.2, 146). Petitioner alleges that he was escorted from the building shirtless and handcuffed, however, the trial court made no findings of fact related to petitioner's condition as he was escorted from the residence and transported to the police station, except to say that it took approximately ten minutes. (H.2, 146-47). The court found that police officers did not question petitioner during the ride from the Poughkeepsie residence to the police station. (H.2, 147).

**\*3** The trial court found that after petitioner arrived at the police station, petitioner volunteered that he was involved in the incident prior to the police officers issuing *Miranda* warnings. (H.2, 147). [3] The trial court also found that petitioner received *Miranda* warnings three times before he gave two more statements that detailed his involvement in the robbery: an oral statement recorded on audio tape, and a signed written statement. (H.2, 147-48). Petitioner did not request to speak with an attorney, and he answered all of the officers' questions. (H.2, 147-48). The trial court found that he "did not appear to be under the influence of alcohol or drugs" while at the police station. (H.2, 148).

The court determined that "defendant was properly advised of his Miranda rights prior to the taken [sic] of either of the statements. That he understood those rights and knowingly voluntarily and intelligently waived those rights. I therefor [sic] find both statements to be

2007 WL 2071742

voluntarily [given] in all respects ...". (H.2, 150). The court denied the defense motion to suppress the statements. (H.2, 150).

After a five day jury trial, Petitioner was convicted of Second Degree Robbery. Petitioner's counsel filed an appeal in the Appellate Division, Third Department. Petitioner's appellate counsel argued legal insufficiency of the evidence; that the petitioner was unable to form the specific intent to commit the crime; and that the confession should have been suppressed. Brief of Appellant, June 1, 2001, included in State Court Records. In affirming the conviction in November 2001, the Appellate Division commented that the use of handcuffs is not dispositive in determining whether an individual is in custody, or whether a statement was given while in custody. *People v. Dluhy,* 288 A.D.2d 693, 732 N.Y.S.2d 724 (3d Dept.2001).

The New York Court of Appeals denied leave to appeal on February 21, 2002. *People v. Dluhy,* 97 N.Y.2d 728, 767 N.E.2d 158 (2002). Petitioner filed a petition for a writ of certiorari in the United States Supreme Court. On October 21, 2002, the Supreme Court denied that petition. *Dluhy v. New York,* 537 U.S. 978, 123 S.Ct. 441 (2002).

After filing his petition in this court, petitioner filed a N.Y. CRIM. PROC. LAW § 440 motion in order to exhaust his Sixth Amendment claim at the state level. The Ulster County Supreme Court denied the motion on the basis of a state procedural default. *People v. Dluhy,* March 17, 2004, Ulster County Court, J. Bruhn (Petitioner's Exhibit A to Dkt. No. 10). The Appellate Division and the Court of Appeals both denied petitioner's motions for leave to appeal in June and August 2004, respectively. *People v. Dluhy,* June 8, 2004, Appellate Division, Third Department; *People v. Dluhy,* 3 N.Y.3d 673, 817 N.E.2d 289 (2004) (Petitioner's Exhibit A at Dkt. No. 10). Petitioner was then granted leave to supplement the pleadings in this action. (Dkt. No. 15).

**2. *Petitioner's Confession***

**\*4** Although petitioner appears to bring several different claims, he basically argues that his confession should have been suppressed. The separate claims are merely separate constitutional bases to achieve the same result. First, petitioner claims that his confession should have been suppressed pursuant to the Fourth Amendment as the result of an unlawful arrest. Petitioner then attempts to claim that his statements should have been suppressed

because they were coerced or involuntary under the Fifth Amendment. Finally, petitioner claims that his statements should have been suppressed because they were taken in violation of his Sixth Amendment right to counsel. The court will discuss each basis separately.

**A. *Fourth Amendment Claim***

It has been well-settled since *Stone v. Powell* that where the state affords a defendant "an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced ... [against him]." *Stone v. Powell,* 428 U.S. 465, 482 (1976). Evidence obtained as a result of a Fourth Amendment violation, including a confession, is subject to the same analysis as the Fourth Amendment violation itself. *Cardwell et al. v. Taylor,* 461 U.S. 571, 573 (1983).[4] Fourth Amendment claims in habeas petitions are reviewed only under certain circumstances: "(a) if the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992) (citing *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir.1977)).

Petitioner's first claim attacks the lawfulness of his arrest and claims that his subsequent confession was the result of that arrest and therefore should have been suppressed. Petitioner fully availed himself of New York's corrective procedures for challenging Fourth Amendment violations. His attorney moved to suppress petitioner's statements to the police, and the court held a *Huntley* hearing. Petitioner's motion to suppress was denied, and petitioner's counsel raised the issue again during the trial. Petitioner had the same counsel that represented him at trial for his appeal, and counsel raised petitioner's "illegal arrest" and argued at every stage of the appeal that the confession should have been suppressed.

Petitioner does not allege or describe any "unconscionable breakdown" in the process, except to say that the issue was decided incorrectly. "Indeed, the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims ... as being facially adequate.'"

*Capellan,* 975 F.2d at 70, n. 1 (quoting *Holmes v. Scully,* 706 F.Supp. 195, 201 (E.D.N.Y.1989) (citing *Gates v. Henderson,* 568 F.2d 830, 837 & n. 4 (2d Cir.1977) and *Shaw v. Scully,* 654 F.Supp. 859, 864 (S.D.N.Y.1987))). To the extent that petitioner challenges the admission of his confession as a violation of his Fourth Amendment rights, petitioner's claim may be dismissed as non-cognizable.

### B. *Fifth Amendment Claim*

#### i. Discerning the Claim

**\*5** Petitioner next claims that his statements were coerced in violation of his Fifth Amendment rights. Petitioner listed these claims in paragraphs 12(b) and 12(c) of the Petition, stating that his "conviction [was] obtained by the use of a coerced and involuntary confession" and that the "conviction [was] obtained by a violation of his Fifth Amendment right." (Dkt. No. 16, Petition, ¶¶ 12(b) and 12(c)). [5] Petitioner stated in the accompanying Memorandum of Law that he "believe[d] it would be in the interest of brevity to only include the two main grounds seeing that the four grounds relied upon in the original petition are really all surrounding one issue." (Dkt. No. 16, Memorandum, 2). Petitioner, therefore, did not discuss the basis of his claim that he was coerced into giving an involuntary confession in his Memorandum of Law, and limited the discussion to the Fourth and Sixth Amendment claims.

Petitioner did, however, refer to a potential Fifth Amendment claim at a few points in his Memorandum of Law. Though he does not mention the Fifth Amendment, petitioner's Statement of Fact includes several numbered paragraphs that discuss when *Miranda* warnings were given (Dkt. No. 16, Memorandum, ¶ 21, 26, 31, 39, 40), details about petitioner's typed statement (Dkt. No. 16, Memorandum, ¶ 27), what the officers and witnesses believed about his level of intoxication (Dkt. No. 16, Memorandum, ¶¶ 27, 65), what clothing petitioner wore during his apprehension (Dkt. No. 16, Memorandum, ¶¶ 50, 55, 63), and whether a psychiatric expert believed petitioner could form "the specific intent to voluntarily confess on December 4, 1998." (Dkt. No. 16, Memorandum, ¶ 68).

In the Argument part of his memorandum, petitioner mentions the Fifth Amendment claim only in passing. He titled the first point of his argument "PETITIONER'S STATEMENT, WHILE COERCED

AND INVOLUNTARY WAS ALSO MADE WHILE HE WAS IN CUSTODY AND MUST BE SUPPRESSED." (Dkt. No. 16, Memorandum, 16). The focus of this part of the memorandum is whether or not petitioner was in custody, or would have believed he was in custody. Petitioner discusses in detail whether the police used "a ruse to elicit incriminating statements without providing the Constitutionally required *Miranda* warnings ." (Dkt. No. 16, Memorandum, 19). Petitioner cites two cases with facts that created a question of whether or not the suspect understood himself to be in custody. (Dkt. No. 16, Memorandum, 21-22). Despite the title of this section of petitioner's memorandum of law, the section itself does not assert any fact or make any argument that shows a coerced or involuntary confession, separate from petitioner's Fourth Amendment claim.

In the second point of the Argument section of petitioner's memorandum of law, petitioner argues primarily in support of his Sixth Amendment claim. However, petitioner parenthetically argues that an evidentiary hearing is necessary for a "totality of the circumstances assessment" related to his involuntariness claim. (Dkt. No. 16, Memorandum, 31). This is the only legal argument in the entirety of petitioner's memorandum of law that is even remotely related to a Fifth Amendment claim.

**\*6** It is unclear on what basis petitioner relies for his Fifth Amendment claim. It seems that petitioner believes that because his apprehension was "illegal," his confession was also illegal. The court notes that petitioner makes only one statement regarding the involuntariness of his confession, but asks the court to examine the totality of the circumstances of his initial apprehension and eventual interrogation-specifically, whether a reasonable person would have felt free to terminate the interrogation and leave. (Dkt. No. 16, Memorandum, 32). This is not a Fifth Amendment argument related to the coercion or involuntariness of a confession. Petitioner has cloaked his Fourth Amendment claim in the terminology of a Fifth Amendment violation. For the reasons discussed in Section A above, petitioner's Fourth Amendment claim is non-cognizable.

#### ii. Exhausting the Claim

To the extent that petitioner has raised a Fifth Amendment claim in his habeas corpus action, the court will examine *sua sponte* whether he has properly raised his

claim [6]. The law is well-settled that prior to bringing a petition for habeas corpus pursuant to 28 U.S.C. § 2254, a petitioner must exhaust his state court remedies with respect to each claim presented in his federal application for habeas relief. *Baldwin v. Reese,* 541 U.S. 27, 29 (2004). The petitioner must "fairly present" his claims in each appropriate state court, alerting the court to the ***federal nature*** of the claim. *Baldwin,* 541 U.S. at 29 (quoting *Duncan v. Henry,* 513 U.S. 364, 365-66 (1995)). The petitioner must have informed the state court of ***both*** the factual ***and*** legal premises of the claims that he is attempting to bring in federal court. *Id.*

As the Second Circuit has held, in order for a petitioner to "invoke one complete round of the State's established appellate review process," he must first appeal his conviction to the Appellate Division and then must seek further review of the conviction by applying for leave to appeal to the New York Court of Appeals. *Smith v. Duncan,* 411 F.3d 340, 345 (2d Cir.2005) (quoting *Galdamez v. Keane,* 394 F.3d 68, 74 (2d Cir.2005)). Applicants for leave to appeal must submit briefs and other documents to the Court of Appeals, identifying the issues upon which the application is based, and must focus upon identifying problems of reviewability and preservation of error. *Smith v. Duncan,* 411 F.3d at 345. The court found that it would undermine the principles of comity to consider a constitutional claim as to which no ruling was requested from the state court. *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991).

In this case, although respondent does not argue that petitioner failed to exhaust this claim, it appears that petitioner did not raise a Fifth Amendment claim in the state in either the Appellate Division or the Court of Appeals. In the Appellate Division, counsel made an exclusively Fourth Amendment argument related to the confession:

**\*7** [t]he illegal and warrantless arrest and subsequent custodial interrogation, resulting in the confession, despite the *Miranda* warnings given just prior to the later taped confession, were all the result of an illegal warrantless search and seizure without probable cause, in violation of the Fourth Amendment.
(Appellant's Brief, included in the State Court records, 41). Counsel also stated "[t]ruly, Dluhy was coerced," but argued specifically that the coercion stemmed

from the fact that petitioner was subject to a custodial interrogation. (Appellant's Brief, 46). In the Application for Leave to Appeal, counsel again cast the claim of an "illegal confession" as the "result of an illegal warrantless arrest ... in violation of the Fourth Amendment." (Application for Leave to Appeal, included in the State Court records, 3).

All of the briefs considered by all of the state courts present the issue of the legality of the confession as part of a Fourth Amendment claim. All of the state courts viewed the inquiry as a question regarding the propriety of the arrest. The Appellate Division, the last court to look at the merits of petitioner's claims, decided the issue based on a Fourth Amendment question regarding the use of handcuffs. *People v. Dluhy,* 288 A.D.2d 693, 732 N.Y.S.2d 724 (3d Dept.2001), citing *People v. Allen,* 73 N.Y.2d 378, 380, 538 N.E.2d 323, 324 (1989). No Fifth Amendment chaim was raised as a separate, federally based claim in any state court. The issue simply has not been fairly presented to the New York courts, and has not been exhausted.

### iii. Procedural Default

If petitioner has not exhausted his state court remedies, but no longer has remedies available in state court with regard to these claims, they are "deemed" exhausted but are also procedurally defaulted. *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (citing *Grey,* 933 F.2d at 120-21), *cert. denied,* 514 U.S. 1054 (1995). A state prisoner who has procedurally defaulted on a federal claim in state court is entitled to federal habeas review of that claim only if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or establish that failure of the court to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 748-50 (1991). A miscarriage of justice occurs if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. 478, 496 (1986).

In this case, petitioner may not return to state court for consideration of this claim. He failed to raise the issue in the Appellate Division, and has already had his one opportunity for appeal to the New York Court of Appeals. *See Grey,* 933 F.2d at 120. Because petitioner cannot return to state court, he has not only failed to exhaust his claim, but has also procedurally defaulted on his Fifth Amendment claim.

**\*8** Federal courts may address the merits of a claim that was procedurally defaulted in state court upon a showing of cause for the default and prejudice to the petitioner. *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977); *Bosset,* 41 F.3d at 829 (2d Cir.1994). When petitioner is not able to show cause for the procedural default, the court need not decide the issue of prejudice, because in order to qualify for habeas review under this exception, petitioner must demonstrate **both** cause and prejudice. *Long v. Lord,* 03-CV-461, 2006 U.S. Dist. LEXIS 50439, \*17-18 (N.D.N.Y. March 21, 2006) (citing *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985)).

Thus, this court must proceed to an analysis of whether petitioner has shown cause and prejudice for the default on this claim. Petitioner has not suggested any reason for his failure to raise this claim in the Appellate Division or the New York Court of Appeals. Petitioner was represented by the same counsel at trial and on appeal. In fact, counsel was involved in the case from prior to the *Huntley* hearing until the denial of the Application for Leave to Appeal by the Court of Appeals. Counsel was not required to raise a Fifth Amendment claim, indeed, there are many reasons why counsel may have chosen not to do so. There are no facts establishing a Fifth Amendment claim, nor has any reason for the default on this claim been raised here. Since petitioner has not established cause for his procedural default concerning these claims, this court need not decide whether he suffered prejudice. *Lord, supra.*

Absent cause and prejudice, the court may also excuse a procedural default if petitioner can show that the failure to review his claims would result in a fundamental miscarriage of justice in that petitioner was "actually innocent." *Sawyer v. Whitely,* 505 U.S. 333, 339 (1992), *see also Murray,* 477 U.S. at 496. To invoke this exception, the petitioner must show "factual innocence," not mere "legal sufficiency," and must present **new and reliable evidence** to show that it is "more likely than not" that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Moore v. Greiner,* 02 Civ. 6122, 2005 U.S. Dist. LEXIS 24184, \*35-37 (S.D.N.Y.2005) (citations omitted). In this case, petitioner has presented no new or reliable evidence. In fact, petitioner has not presented **any** evidence regarding the issue of innocence.

The court finds that petitioner has not shown cause and prejudice for his failure to bring his Fifth Amendment

claim in the New York state courts, and that failure to review this claim will not result in a fundamental miscarriage of justice. This court finds that the Fifth Amendment claim may be "deemed" exhausted, but finds that consideration of this claim is barred by procedural default.

### C. Sixth Amendment Claim

Petitioner makes two claims that his statements were taken in violation of his constitutional right to counsel. The first claim is that at the time he made his statements, petitioner "was represented by counsel on an unrelated charge in Ulster county, including a traffic infraction in the Town of Lloyd." (Dkt. No. 16, 23). Petitioner cites Article 1, Section 6 of the New York State Constitution, as well as two New York state cases, for the proposition that "the indelible right to counsel" attaches "once an arrest is authorized." (Dkt. No. 16, 22). Petitioner argues that because he had retained counsel on the unrelated matter, his right to counsel on the newer burglary charge had already attached, and police should not have questioned petitioner without counsel. (Dkt. No. 16, 31).

**\*9** The second claim alleges that the Town of Lloyd issued an arrest warrant in advance of the events at the residence in Poughkeepsie. Petitioner argues that the issuance of an arrest warrant is a "critical stage" of a criminal prosecution, and that his Sixth Amendment right to counsel attached when the warrant was issued. Therefore, petitioner argues, his right to counsel was violated because questioning began outside the presence of his attorney, at a "critical stage" of the proceeding.

#### i. Indelible Right to Counsel

With respect to petitioner's argument regarding his representation by counsel on another charge, the court notes that "a district court is 'limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.' " *Beekman v. Lacy* 918 F.Supp. 57, 63 (N.D.N.Y., 1996) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)). *See also* 28 U.S.C. § 2254(a). The particular right to counsel that petitioner asserts here arises under New York law. *Beekman,* 918 F.Supp. at 63. In this area, it is well-settled that the New York rule is broader than the federal rule, and cannot be a basis for relief under 28 U.S.C. 2254. *Id. See also, Key v. Artuz,* 2002 U.S. Dist. LEXIS 17712, \*12 (E.D.N.Y., 2002) (alleged Sixth Amendment violation based on representation on

unrelated charge not cognizable on federal habeas review); *Ballew v. Walker,* 1999 U.S. Dist. LEXIS 22511, *11 (W.D.N.Y., 1999) (no "indelible" right to counsel based on representation on prior pending charge) (*citing United States v. Broccolo,* 797 F.Supp. 1185, 1196 (S.D.N.Y., 1992)).

In *Texas v. Cobb,* the Supreme Court stated that the "Sixth Amendment right to counsel is personal to the defendant and specific to the offense." *Texas v. Cobb,* 532 U.S. 162, 172 (2001). Even if petitioner had been represented on an unrelated, prior charge at the time he made his statements to police, it would not be a basis for claiming a violation of petitioner's federal Sixth Amendment right to counsel. The federal rule permits the questioning of petitioner while he is represented on an unrelated charge. *McNeil v. Wisconsin,* 501 U.S. 171 (1991). Thus, petitioner's Sixth Amendment claim, based solely on New York law, may be dismissed as non-cognizable.

### ii. Arrest Warrant

Petitioner's second Sixth Amendment argument is based on the "recent discovery of [an] arrest warrant" that was issued from the Town of Lloyd on the same day that petitioner gave his statement to police. (Dkt. No. 16, 26). Petitioner's allegation is that the warrant was issued before police officers went to the Poughkeepsie residence to question petitioner.

Petitioner's attorney did not raise this issue on direct appeal to the Appellate Division or the Court of Appeals. Petitioner did not raise this issue until after he filed the original petition in this court. This court has not been provided with the motion papers, but petitioner did attach the state court's CRIM. PROC. LAW § 440.10 decision to his motion to supplement the pleadings in this court. (Exhibit A, Dkt. No. 10).

 *10 On March 17, 2004, the Ulster County Supreme Court found that petitioner did not submit "any evidence which is 'new' within the meaning of the statute. *People v. Dluhy,* March 17, 2004, J. Bruhn (Petitioner's Exhibit A at Dkt. No. 10). The court stated that petitioner's arguments were "either determined on the merits of his appeal ... or were unjustifiably not raised ...." *Id.* On June 8, 2004, the Appellate Division denied leave to appeal the Ulster County Court order. *People v. Dluhy,* June 8, 2004, Appellate Division, Third Department, J. Rose (Petitioner's Exhibit A at Dkt. No. 10). The Court

of Appeals rejected petitioner's application for leave to appeal in August 2004. *People v. Dluhy,* 3 N.Y.3d 673, 817 N.E.2d 829 (2004) (Petitioner's Exhibit A at Dkt. No. 10). Defendant argues that this claim is procedurally barred.

It is well settled that federal courts will not consider federal claims decided in state court "if [the state court] judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed,* 489 U.S. 255, 260 (1989). Under *Harris v. Reed,* "a federal claimant's procedural default precludes federal habeas review, like direct review, only if the last state court rendering a judgment in the case rests its judgment on the procedural default." *Harris v. Reed,* 489 U.S. at 262. Furthermore, as stated above, a state prisoner who has procedurally defaulted on a federal claim in state court is entitled to federal habeas review of that claim *only* if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can establish that failure of the court to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 748-50 (1991). A miscarriage of justice will have occurred if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. 478, 496 (1986).

Here, the Ulster County Supreme Court found that petitioner had not submitted "new" evidence, and that petitioner's arguments were "either determined on the merits of his appeal ... or were unjustifiably not raised ...." *People v. Dluhy,* March 17, 2004, J. Bruhn (Petitioner's Exhibit A at Dkt. No. 10). Because petitioner's Sixth Amendment claim was *not* raised on appeal, the § 440.10 court must have found that petitioner's failure to raise the issue was "unjustified." Therefore, the denial of petitioner's Sixth Amendment claim was based on a procedural default.

Petitioner argues that the "cause" for his default is that the arrest warrant was not disclosed to his counsel in advance of trial. However, Ulster County Supreme Court did not find petitioner's late discovery of the warrant a justifiable reason for the default, and the Appellate Division and Court of Appeals declined to review the decision. This court will not disturb the state courts' finding. Since petitioner has not established cause for his procedural default concerning this claim, this court need not decide

2007 WL 2071742

whether he suffered prejudice. *Lord, supra.* Petitioner has made no allegation of his actual innocence. Thus, petitioner's Sixth Amendment challenges to his conviction may be dismissed.

**\*11 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED and DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Halth and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2071742

Footnotes

1    The proprietor testified "... the stockroom door was closed and I see some noise so I take a look in the monitor that I have right next to my desk and I see that like, you know, the person with the gun and I see some, notice like, you know, he running towards here ... [another employee] was mopping the floor and someone holding the gun and you know, then I opened, I was just trying to get out, I opened the door and I see like, you know, [the employee] was right behind the door and someone was lying on the floor with a gun on his right-hand side." (T. 3, 60). It is unclear from the testimony who was running towards the stockroom door, but it seems likely that the suspect slipped and fell on the wet, just-mopped floor before the proprietor came out of the stockroom.

2    *People v. Huntley,* 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 173 (1965).

3    A police officer testified that while in the hallway outside an interrogation room, petitioner acknowledged, "I know why I'm here-it's in reference to the robbery." (H.1, 104).

4    *Cardwell et al. v. Taylor* states that "[o]nly if the statements were involuntary, and therefore obtained in violation of the Fifth Amendment, could the federal courts grant relief on collateral review." *Cardwell,* 461 U.S. at 573. Where, as in *Cardwell,* statements are alleged to have been obtained in violation of the Fourth Amendment (e.g. after an illegal arrest), the Fourth Amendment analysis is necessary, and usually will result in a non-cognizable claim.

5    In this section of the Report-Recommendation, the two parts of Docket Number 16 are distinguished by noting whether the citation refers to the Petition or the Memorandum of Law. Because petitioner submitted them together after he was granted leave to amend his petition, both items appear as Docket Number 16 on the Docket Sheet. Usually, the petition is submitted before the Memorandum of Law. This is the only section of the Report-Recommendation where such a distinction is necessary-all other citations to Docket Number 16 refer to the Memorandum of Law.

6    *See Lurie v. Wellner,* 228 F.3d 113, 123 (2d Cir.2000) (court may consider exhaustion sua sponte, absent *express* waiver by respondent).

**End of Document**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:14-cv-01230-MAD-TWD   Document 21   Filed 05/17/17   Page 57 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

2014 WL 28995
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Randy WILENS, Petitioner,
v.
SUPERINTENDENT OF CLINTON
CORRECTIONAL FACILITY, Respondent.

No. 11–CV–1938 (JFB).
|
Dec. 31, 2013.

**Attorneys and Law Firms**

Randy Wilens, pro se.

Thomas Spota, District Attorney of Suffolk County, by Michael Herman Blakey, Riverhead, NY, for Respondent.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

*1 Randy Wilens ("Petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his October 25, 2005 conviction in state court. Under Suffolk County Indictment Number 1020–2005, Petitioner was charged with two counts of Course of Sexual Conduct Against a Child in the First Degree (N.Y. Penal Law § 130.75(1)(a)), two counts of Course of Sexual Conduct Against a Child in the Second Degree (N.Y. Penal Law § 130.80(1)(a)), three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)), and five counts of Endangering the Welfare of a Child (N .Y. Penal Law § 260.10(1)). Petitioner pled guilty to the indictment and was sentenced, as a prior felony offender, to an aggregate term of fourteen years' incarceration with five years post-release supervision ("PRS").

Petitioner now challenges his conviction, arguing that: (1) his Fourteenth Amendment due process rights were violated because he was not informed of the mandatory post-release supervision ("PRS") as a component of his sentence; (2) he received ineffective assistance of counsel when his attorney failed to advise him of PRS accompanying the sentence, failed to object to duplicate counts in the indictment, and failed to file an appeal; (3) his allocution was insufficient to support a conviction for the crimes alleged; and (4) the District Attorney committed *Brady* and *Rosario* violations by failing to disclose Family Court findings and medical reports related to the case.

For the reasons set forth herein, the Court finds that Petitioner has not demonstrated any basis for habeas relief. Most of Petitioner's claims are procedurally barred. In any event, all of Petitioner's claims fail on the merits. The Court, therefore, denies the petition in its entirety.

**I. BACKGROUND**

A. Facts

1. The Plea

On August 30, 2005, Petitioner entered a plea before the Honorable Michael Mullen. Under advice of counsel, Petitioner was sworn in (P. 4), [1] and affirmed that he freely entered his guilty plea while waiving his constitutional and statutory trial rights. (P. 5–6.) Petitioner allocuted to his guilt on the offenses charged, admitting that: (1) at least three times within a three month period between 2002 and 2004, he subjected a female child, who was less than eleven years of age, to sexual contact and sexual intercourse for his sexual gratification (*id.* at 7–8); (2) between September 2003 and July 2004, on three occasions within a three month period, at his residence in Suffolk County, he had sexual contact with a male child, who was less than eleven years of age, including one incident of oral sexual conduct (*id.* at 9–10); (3) at his residence in Suffolk County, in July 2004, he had sexual intercourse with a male, who was less than eleven years of age, for his own sexual gratification (*id.* at 11–12); (4) he had sexual contact with another male who was less than eleven years of age for his own sexual gratification (*id.* at 12–13); (5) he twice exposed himself to a female less than seventeen years of age (*id.* at 15–16); (6) in October 2004, at a house in Suffolk County, he had sexual contact with a female, who was under eleven years of age, for his own sexual gratification (*id.* at 13–14); (7) at a house in Suffolk County, in the autumn of 2004, he played pornographic video tapes for a minor under eleven years of age (*id .* at 14); (8) in the autumn of 2004, he displayed lewd images from his cell phone to a child under seventeen years of age (*id.* at 14–15); and (9) he endangered

Case 9:14-cv-01230-MAD-TWD   Document 21   Filed 05/17/17   Page 58 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

the physical, mental, and moral welfare of four children under seventeen years of age (*id.* at 16).

**\*2** The court was satisfied with the allocution and Petitioner was found guilty of all charges which consisted of: (1) two counts of Course of Sexual Conduct Against a Child in the First Degree (N.Y. Penal Law § 130.75(1) (a)); (2) two counts of Course of Sexual Conduct Against a Child in the Second Degree (N.Y. Penal Law § 130.80(1) (a)); (3) three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)); and (4) five counts of Endangering the Welfare of a Child (N.Y. Penal Law § 260.10(1)). (P. 16–17.)

### 2. The Sentencing

At the sentencing hearing on October 25, 2005, Petitioner was sentenced as a Persistent Felony Offender ("P.F.O.") after admitting to a prior conviction of Sodomy in the First Degree, a class "B" felony. (S.5–6.)[2] The court sentenced Petitioner as follows: (1) for two counts of Course of Sexual Conduct Against a Child in the Second Degree, Petitioner was sentenced to two concurrent terms of seven-years' incarceration with three-years' PRS (*id.* at 9–10); (2) for two counts of Course of Sexual Conduct Against a Child in the First Degree, Petitioner was sentenced to two concurrent terms of fourteen-years' incarceration with five-years' PRS (*id.* at 10); (3) for three counts of Sexual Abuse in the First Degree, the court sentenced Petitioner to three concurrent terms of seven-years incarceration with three-years' PRS (*id.* at 10); and (4) for five counts of Endangering the Welfare of a Child, the court sentenced Petitioner to five concurrent terms of one year of incarceration. (*Id.* at 10–11.) All terms of the sentence were ordered to run concurrently.

### B. Procedural History

Petitioner filed a notice of motion for sentence reduction on November 17, 2005. His court appointed defense counsel argued that, in the interest of justice, the sentence should be reduced from 14 years, to the minimum 10 years, as the imposed sentence was harsh and excessive. (Notice of Motion for Sentence Reduction, Dec. 31, 2007, Indictment Number 1020–2005.) Petitioner also wrote a letter to the Appellate Division seeking permission to file a *pro se* supplemental brief. The Appellate Division granted the request. Through his Supplemental Brief filed October 30, 2007, Petitioner claimed that his sentence was harsh and excessive and should be reduced because (1) his plea

was unknowingly made, as he was not made aware of post-release supervision accompanying the plea, and (2) his counsel was ineffective for failing to raise specific *Brady* or *Rosario* material, failing to file an appeal, and failing to inform Petitioner of PRS. (Notice of Motion for Sentence Reduction–Supplemental Brief, Oct. 30, 2007, Indictment Number 1020–2005) The Appellate Division affirmed the sentence on March 4, 2008 without an opinion. *People v. Wilens,* 49 A.D.3d 570 (N.Y.App.Div.2008). Petitioner sought leave to appeal from the Court of Appeals, which was denied. *People v. Wilens,* 10 N.Y.3d 965, 863 N.Y.S.2d 149, 893 N.E.2d 455 (2008).

**\*3** Petitioner then filed a motion under N.Y.C.P.L. § 440.10 ("Pet'r's 440 Mot.") to vacate the judgment with the Suffolk County Supreme Court, arguing that: (1) his plea was not knowingly, intelligently, and voluntarily made because he was not made aware of the PRS, thus violating his due process rights (Pet'r's 440 Mot. at 1–2); (2) he received ineffective assistance of counsel for failing to object to alleged duplicate counts on the indictment, failing to advise him of PRS, and coercing Petitioner to accept the plea agreement (*id.* at 3–4, 863 N.Y.S.2d 149, 893 N.E.2d 455); (3) the allocution was insufficient to cover the elements of the crimes (*id.* at 2, 863 N.Y.S.2d 149, 893 N.E.2d 455); and (4) the prosecutor committed *Brady* and *Rosario* violations for failing to disclose a finding of not guilty to a charge of abuse in Family Court. (*Id.* at 3–4.)

The Suffolk County Supreme Court denied the motion in full. *People v. Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty. Sept. 10, 2010). First, the court reasoned, based on the record, that Petitioner failed to show how his plea was unknowingly, unintelligently, or involuntarily made. *Id.* Furthermore, the court held that the claim was "wholly based on the record and as such not subject to review in a '440' proceeding." *Id.* (citing N.Y.C.P.L. § 440.10(2)(c); *People v. Byrdsong,* 234 A.D.2d 468, 651 N.Y.S.2d 903 (2d Dep't 1996)). Second, the court concluded that Petitioner failed to support his claim of ineffective assistance of counsel with any evidence other than a self-serving affidavit and was not borne out by the record. *Id.* (citing *People v. Mackenzie,* 224 A.D.2d 173, 637 N.Y.S.2d 128 (1st Dep't 1996)). Third, the court held that "[t]he defendant's claim that the impositions of a period of five years post release supervision was error requiring relief was again record based and not subject to review." *Id.* Fourth, the court held the alleged *Rosario*

Case 9:14-cv-01230-MAD-TWD    Document 21    Filed 05/17/17    Page 59 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

and *Brady* violations were presented without any evidence and had no merit. However, the court did not specifically address whether there was an insufficient allocution to cover the elements of the crimes (which had been raised in a one-sentence argument by Petitioner). *Id.* The Appellate Division denied Petitioner's certificate for leave to appeal. *People v. Wilens,* A.D. No.2010–10180 (2d Dep't Dec. 23, 2010). Petitioner's motion to reargue the denial of leave to appeal was again denied by the Appellate Division. *People v. Wilens,* A.D. No 2010–10180 (2d Dep't Mar. 31, 2011).

Petitioner then filed a *pro se* Petition for Writ of Habeas Corpus ("Pet'r's Habeas Pet.") on August 22, 2011, raising four grounds for relief. First, Petitioner argues that his plea violated the Due Process Clause of the Fourteenth Amendment because it was not made voluntarily, knowingly, and intelligently, as he was not made aware that PRS was a component of his sentence. (Pet'r's Habeas Pet. at 1.) Second, Petitioner argues that he had ineffective assistance of counsel because his attorney failed to: (1) advise him of the direct consequences of PRS; (2) advise him of his right to appeal; (3) file an appeal; and (4) object to duplicate counts on the indictment. (*Id.* at 3, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Third, Petitioner argues that his allocution was insufficient to support the elements of the crimes charged. (*Id.* at 6, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Finally, Petitioner alleges that the prosecution committed *Brady* and *Rosario* violations by withholding certain medical records and a finding of 'Not Guilty' of abuse in his Family Court case, which related to this criminal matter. (*Id.* at 3–4.) Respondent filed a memorandum of law in opposition to the petition on July 27, 2012. ("Resp.Br.") The Court has fully considered the submissions and arguments of the parties.

## II. STANDARD OF REVIEW

**\*4** To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). " 'Clearly established Federal law' " is comprised of " 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: " 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.' " *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Williams,* 529 U.S. at 411). Additionally, while " 'some increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Id.* (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*' " *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir.2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)).

Case 9:14-cv-01230-MAD-TWD    Document 21    Filed 05/17/17    Page 60 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

## III. DISCUSSION

For the reasons discussed below, this Court denies the petition for habeas corpus. As a threshold matter, the due process claim is procedurally barred because the state court found that claim to be a record-based claim that is not subject to review in a Section 440 motion. However, in an abundance of caution, the Court has analyzed the merits of every claim and concludes that Petitioner's claims are entirely without merit.

### A. Procedural Bar

#### 1. Exhaustion

**\*5** As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida,* 549 U.S. 327, 333, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007), a petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)) (alteration in original and quotation marks omitted).

Passage through the state courts, in and of itself, "is not sufficient." *Picard,* 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see also Duncan,* 513 U.S. at 365–66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Jones v. Keane,* 329

F.3d 290, 294–95 (2d Cir.2003) (citation and internal quotation marks omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye v. Att'y Gen. Of N.Y.,* 696 F.2d 186, 191–92 (2d Cir.1982) (en banc). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* at 191–92 (footnote omitted).

#### 2. State Procedural Requirements

Similar to the failure to exhaust a claim, the failure to satisfy the state's procedural requirements will deprive the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson,* 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Reyes v. Keane,* 118 F.3d 136, 140 (2d Cir.1997) (quoting *Coleman,* 501 U.S. at 735) (emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are ... to be deemed exhausted." *DiGuglielmo v. Smith,* 366 F.3d 130, 135 (2d Cir.2004). Notably, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes,* 118 F.3d at 139 (citations and internal quotation marks omitted).

**\*6** However, even where a plaintiff properly exhausts his claim, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (citing *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Coleman,* 501 U.S. at 744–51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and

Case 9:14-cv-01230-MAD-TWD   Document 21   Filed 05/17/17   Page 61 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray,* 518 U.S. at 162.

The procedural bar rule in the review of applications for writs of habeas corpus is based on the "comity and respect" accorded to state judgments. *House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Coleman,* 501 U.S. at 730–31.

Once it is determined that a claim is procedurally barred under state rules, a federal court may review such a claim on its merits only if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id.* at 750. A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier,* 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that in light of new reliable evidence not presented at trial, " 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt' " and would require " 'new reliable evidence ... that was not presented at trial.' " *House,* 547 U.S. at 537 (quoting *Schlup v. Delo,* 513 U.S. 324, 327 (1995)).

### 3. Application

"The burden of proving exhaustion lies with the habeas petitioner." *Cartagena v. Corcoran,* No. 04–CV–4329, 2009 WL 1406914, at *3 (E.D.N.Y. May 19, 2009). The Court concludes that Petitioner has not met this burden with respect to his due process claim, as it was not "fairly presented" in state court. Petitioner never sought reversal of his conviction, but rather merely sought a sentence reduction under state law. As discussed *supra,* Petitioner on direct appeal argued to reduce his sentence under N.Y.Crim. Proc. Law 470.15(2)(c) and 470.20(6), claiming that it was harsh and excessive. Courts have correctly found that a prisoner's reliance on a state procedural law granting courts discretionary authority to reduce sentences does not "fairly present" a constitutional claim in state court. *King v. Cunningham,* 442 F.Supp.2d

171, 181 (S.D.N.Y.2006) (collecting cases); *Castillo v. Abrams,* No. 88–CV–1165, 1988 WL 96026, at *1–2 (S.D.N.Y. Aug. 24, 1988) ("Asking a state court to use its discretionary authority to reduce a sentence [under New York's Criminal Procedure Laws], without more, is not enough to alert the court that the claim is of constitutional dimension.") Accordingly, Petitioner's due process claim is unexhausted, and thus, cannot be reviewed by this Court.

**\*7** However, Petitioner, through his § 440.10 motion to vacate, did seek reversal on the same grounds that he alleges in this petition-namely, (1) due process violations because the plea was not knowingly made; (2) ineffective assistance of counsel; (3) insufficient allocution; and (4) *Brady* and *Rosario* violations. Petitioner also argued that post-release supervision should not have been imposed. The Supreme Court of Suffolk County, through its § 440.10 order, made clear that the due process claim was procedurally barred because it was recordbased. *People v. Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty. Sept. 10, 2010). Accordingly, Petitioner's claim that his plea was not knowingly and voluntarily made is procedurally barred because the court's ruling was based on an independent and adequate state procedural rule. [3]

In order to overcome the procedural bar, Petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750. Petitioner has not satisfied this standard. Petitioner has not provided any explanation for his failure to properly exhaust the due process claim. Moreover, Petitioner has failed to demonstrate any prejudice for his failure to exhaust, and he has not demonstrated that a fundamental miscarriage of justice will take place if the Court fails to consider the procedurally defaulted claims. *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In any event, that claim, as well as all of Petitioner's other claims, are without merit for the reasons discussed below.

### B. Merits Analysis

### 1. Due Process Claim

Petitioner claims that his due process rights under the Fourteenth Amendment were violated because he was unaware of PRS accompanying his sentence. Therefore,

Case 9:14-cv-01230-MAD-TWD Document 21 Filed 05/17/17 Page 62 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

he alleges that the plea was not made voluntarily, knowingly, and intelligently. As discussed below, this claim has no merit.

a. Legal Standard

"The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant ." *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (internal quotation marks and citations omitted)); *see also Parke v. Raley,* 506 U.S. 20, 28–29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) (plea is valid when it is both knowingly and voluntarily made). Where "a defendant is represented by counsel during the plea process, and enters his plea upon the advice of counsel, the voluntariness of the plea depends upon whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Hill,* 474 U.S. at 56 (internal quotation marks and citations omitted).

The Supreme Court has held that, under the Due Process Clause of the United States Constitution, a trial court can only accept a guilty plea which is done "voluntarily, knowingly, and intelligently, with sufficient awareness of relevant circumstances and likely consequences." *United States v. Adams,* 448 F.3d 492, 497 (2d Cir.2006) (internal quotation marks and citations omitted); *accord Godinez v. Moran,* 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). Although a guilty plea "is not ordinarily subject to collateral attack," it "may be collaterally attacked if it was not knowing or not voluntary...." *Salas v. United States,* 139 F.3d 322, 324 (2d Cir.1998); *see also U.S. ex rel Scott v. Mancusi,* 429 F.2d 104, 107 (2d Cir.1970) ("[A] conviction which is based upon an involuntary plea of guilty is inconsistent with due process of law and is subject to collateral attack by federal habeas corpus.").

**\*8** "A plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a rudimentary way,' and it is considered 'voluntary if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally.' " *Manzullo v. New York,* No. 07 CV 744(SJF), 2010 WL 1292302, at \*5 (E.D.N.Y. Mar.29, 2010) (quoting *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.1988)). Indeed, a "plea of guilty entered by one fully aware of the direct consequences of the plea

is voluntary in a constitutional sense unless induced by threats, misrepresentations, or perhaps by promises that are by their nature improper." *Bousley v. United States,* 523 U.S. 614, 619, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal alteration, citations, and quotation marks omitted).

b. Application

Under New York law, the trial court should have advised Petitioner of the five-year mandatory PRS. In *People v. Catu,* the Court of Appeals held that "[b]ecause a defendant pleading guilty to a determinate sentence must be aware of the postrelease supervision component of that sentence in order to knowingly, voluntarily and intelligently choose among alternative courses of action, the failure of a court to advise of postrelease supervision requires reversal of the conviction." 4 N.Y.3d 242, 245, 792 N.Y.S.2d 887, 825 N.E.2d 1081 (2005).

However, under AEDPA, this Court may only grant relief if the state court "unreasonably applied clearly established Federal law." *Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (alterations omitted) (quoting 28 U.S.C. § 2254(d)(1)). " ' Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Therefore, this Court cannot grant a petition for habeas corpus if the state court unreasonably applied *state* law; instead, this Court may only grant relief unless the state court unreasonably applied federal law that has been clearly defined by Supreme Court precedents (or was a result of an unreasonable determination of the facts in light of the record). *See Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (citations and internal quotation marks omitted)).

"Unfortunately for Petitioner, there is no clearly established Supreme Court precedent that a defendant must be advised of mandatory post-release supervision prior to entering a guilty plea. Many federal courts in this Circuit have recently come to this same conclusion." *Sanchez v. Keller,* 06–CIV–3370, 2007 WL

Case 9:14-cv-01230-MAD-TWD    Document 21    Filed 05/17/17    Page 63 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

4927791, at *7 (S.D.N.Y. Dec.4, 2007) (Report and Recommendation); *see also Facen v. Cully,* 787 F.Supp.2d 278, 284 (W.D.N.Y.2011) (stating that "the Supreme Court has never held that a mandatory term of post-release supervision is a direct consequence of a criminal conviction"); *Potter v. Green,* 04–CV–1343, 2009 WL 2242342, at *6 (E.D.N.Y. July 24, 2009) ("[T]here is no clearly established Supreme Court precedent that requires a state court judge to advise a defendant of mandatory PRS before accepting a guilty plea."). In fact, as noted by the Seventh Circuit, "the Court has expressly declined to decide such an issue in the very similar context of parole." *Lockhart v. Chandler,* 446 F.3d 721, 724 (7th Cir.2006) (citing *Lane v. Williams,* 455 U.S. 624, 630 n. 9, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982)). This Court finds the analysis contained in these cases persuasive.

**\*9** Therefore, because the Supreme Court has not ruled directly on this issue, the failure of the state court to advise Petitioner at his plea about the mandatory PRS is not a basis for habeas relief. *See Sanchez,* 2007 WL 4927791, at *8 ("[B]ecause the Supreme Court has never addressed the issue of whether mandatory supervised release is a direct consequence of one's conviction, the trial court's failure to inform Petitioner of his mandatory PRS cannot be a violation of clearly established federal law. In other words, Petitioner's claim is without merit because there is no clearly established Supreme Court precedent for the trial court to have unreasonably applied."); *see also Lane,* 446 F.3d at 724; *Facen,* 787 F.Supp.2d at 284; *Menjivar v. Sears,* 06 CV 2854, 2007 WL 2274892, at *3 (E.D.N.Y. Aug.7, 2007).[4]

In addition, although this could end the Court's inquiry, the Court notes that Petitioner must also demonstrate that "there is a reasonable probability that, but for the error, he would not have entered the plea." *Zhang v. United States,* 506 F.3d 162, 168 (2d Cir.2007) (citation and internal quotation marks omitted). Petitioner provides no evidence that he would not have entered his guilty plea had the court informed him of the mandatory PRS, and it appears highly improbable that the PRS played any role in his decision to accept or reject the plea. In fact, during the sentencing hearing, Petitioner admitted that the plea bargain, struck by him and for his benefit, was "favorable."[5] (S. at 7.) More importantly, Petitioner was made aware of the PRS at his sentencing hearing. For each charge, the sentencing state judge, informed Petitioner of the mandatory five-year PRS accompanying the charges.

(S. at 10.) At no time did Petitioner object to the PRS, indicate that he was unaware that PRS was mandated in accordance with state law, or state that he wished to withdraw his previously entered plea. Therefore, as in *Sanchez,* "Petitioner's claim-that the failure to inform him of mandatory PRS prior to the entry of his guilty plea was a violation of his due process rights-can be dismissed as harmless error, because even if he had know about the PRS, such knowledge would likely not have affected his decision." *Sanchez,* 2007 WL 4927791, at *9.

**2. Ineffective Assistance of Counsel**

Petitioner contends that he received ineffective assistance of counsel, specifically that his counsel failed to object to duplicate counts on the indictment, failed to file a Notice of Appeal, and failed to advise him of the PRS accompanying the guilty plea. As discussed below, this claim is meritless.

**a. Legal Standard**

Under the standard promulgated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 680, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

**\*10** The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' " *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a " 'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.' " *Id.* (quoting *Rompilla v. Beard,* 545 U.S. 374, 408, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.' " *Id.* (quoting *Strickland,* 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute

Case 9:14-cv-01230-MAD-TWD    Document 21    Filed 05/17/17    Page 64 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord,* 77 F.3d 578, 588 n. 3 (2d Cir.1996), and " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Id.* at 588 (quoting *Strickland,* 466 U.S. at 690–91). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id.* (quoting *Strickland,* 466 U.S. at 690–91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they " 'undermine[ ] confidence in the outcome.' " *Pavel v. Hollins,* 261 F.3d 210, 216 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 694). " '[T]he question to be asked in assessing the prejudice from counsel's errors ... is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilty.' " *Henry v. Poole,* 409 F.3d 48, 63–64 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 695). " 'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.' " *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of Strickland, the determination of prejudice may be made with the benefit of hindsight ." *Hemstreet v. Greiner,* 491 F.3d 84, 91 (2d Cir.2007) (internal citation and quotation marks omitted).

**\*11** This Court proceeds to examine Petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir.2004).

b. Application

i. Failure to Object to Duplicate Counts on the Indictment

Petitioner alleges that his trial counsel failed to object to duplicate counts contained within the indictment.

Specifically, Petitioner asserts that under N.Y. Penal Law § 130.75(2) and N.Y. Penal Law § 130.80(2), a defendant may not be subsequently prosecuted for any other sexual offense involving the same victim. Petitioner argues that he was charged twice for acts upon the same victim under Counts I and III, and for Counts II and IV, and that he suffered prejudice as a result of the his attorney's inaction.

First, this Court finds defense counsel's conduct was not deficient because he sought to have the indictment dismissed on any plausible grounds. Defense counsel filed a motion for the trial court to review the Grand Jury minutes and sought dismissal of the charges. The court, in response to counsel's motion, concluded that the minutes were sufficient and denied counsel's application to dismiss or reduce the charges. *People v. Wilens,* Ind. No. 1020–2005 (Sup.Ct., Suffolk Cnty. July 26, 2005).

Second, Petitioner has failed to show that these alleged duplicate counts caused any prejudice and thus fails the second prong under the *Strickland* test. The New York legislature was careful to avoid double jeopardy concerns under N.Y. Penal Law § 130 .75(2) and § 130.80(2) by enacting N.Y. Penal Law § 70.25(2)(e). N.Y. Penal Law § 70.25(2)(e) states:

> Whenever a person is convicted of course of sexual conduct against a child in the first degree as defined in section 130.75 or course of sexual conduct against a child in the second degree as defined in section 130.80 and any other crime under article one hundred thirty committed against the same child and within the period charged under section 130.75 or 130.80, the sentences *must run concurrently.*

N.Y. Penal Law § 70.25(2)(e) (emphasis added). At sentencing, Petitioner was sentenced to fourteen years and seven years for Counts One and Three, respectively. For Counts Two and Four, the state judge again sentenced the Petitioner to fourteen and seven years, respectively. The sentences were to run concurrently, not consecutively. Therefore, Petitioner was not subject to prejudice, and his claim must fail.

Furthermore, by pleading guilty, the Petitioner waived any argument that counsel was ineffective for failing to

Case 9:14-cv-01230-MAD-TWD   Document 21   Filed 05/17/17   Page 65 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

challenge the indictment. *See Schwartz v. Connell,* 05 CIV. 10305, 2006 WL 3549660, at *5 (S.D.N.Y. Dec.6, 2006) ("A motion to dismiss for a duplicitous indictment is similar to a speedy trial motion in that both can result in a dismissal of charges against the defendant. Both errors, however, are rendered irrelevant in the face of defendant's plea of guilty since this admission is, in most cases, convincing factual evidence of actual guilt."); *People v. Thomas,* 2 A.D.3d 982, 768 N.Y.S.2d 519, 520 (3d Dep't 2003) (holding a claim of ineffective assistance of counsel, predicated on counsel's failure to challenge the indictment, was waived as the alleged failures did not undermine the voluntariness of defendant's guilty plea).[6]

ii. Failure to File a Notice of Appeal

**\*12** Petitioner claims that his trial counsel was ineffective because counsel did not file a Notice of Appeal. In *Roe v. Flores–Ortega,* 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), the Supreme Court applied the *Strickland* test with regard to a claim that counsel was constitutionally ineffective for failing to file a Notice of Appeal. The Court noted that it had "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Id.* at 477. However, the Court held that, in cases where the defendant "neither instructs counsel to file an appeal nor asks that an appeal not be taken," the first question is whether counsel "in fact consulted with the defendant about an appeal." *Id.* at 478. If the attorney consulted with the defendant, counsel "performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Id.* If, however, counsel has not consulted with the defendant, the relevant inquiry is "whether counsel's failure to consult with the defendant itself constitutes deficient performance." *Id.* The Court rejected a bright-line rule that counsel must always consult with a defendant regarding an appeal. *Id.* at 480. Instead, the Court held that "counsel has a constitutionally-imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal ... or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* In making this determination, courts should consider "whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end

to judicial proceedings." *Id.* Where a defendant pleads guilty, courts should consider factors such as "whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Id.* If the court determines that counsel's performance was deficient, the court must turn to the second prong of the *Strickland* rule-whether counsel's deficient performance prejudiced the defendant. "[T]o show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484. If so, a presumption of prejudice arises. *Id.*

In the instant case, Petitioner, in his *pro se* appellate brief, repeatedly states that he attempted to contact and inform his attorney to file an appeal, but his attempts were futile. (Pet'r's Habeas Pet. at 3.) Assuming that no such consultation occurred, the relevant question becomes whether "there is reason to think either (1) that a rational defendant would want to appeal, or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores–Ortega,* 528 U.S. at 480.

**\*13** Petitioner pled guilty, which "reduces the scope of potentially appealable issues" and "may indicate that the defendant seeks an end to judicial proceedings." *Id.* However, Petitioner has a right to appeal, and his attorney must respect this right. Assuming *arguendo* that counsel's performance was deficient for failing to appeal or failing to consult Petitioner about an appeal, that deficiency did not create any prejudice and fails the second prong of *Strickland.* Petitioner filed his own Notice of Appeal in a timely manner. Subsequently, Petitioner was assigned appellate counsel. Appellate counsel filed a motion with the Appellate Division to reduce Petitioner's sentence and Petitioner was able to file his own *pro se* supplemental brief. Not only did appellate counsel raise what he believed to be a meritorious issue on appeal, but Petitioner himself raised his own issues. Both motions were heard and subsequently denied. Therefore, Petitioner did not suffer any prejudice. *See id.* at 484 (rejecting rule that failure to file appeal results in prejudice *per se* because this rule "ignores the critical requirement that counsel's deficient performance must actually cause *the forfeiture of the defendant's appeal.*" ) (emphasis added).

iii. Failure To Advise Him Of The Mandatory PRS Accompanying The Guilty Plea

Case 9:14-cv-01230-MAD-TWD   Document 21   Filed 05/17/17   Page 66 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

Petitioner alleges his defense counsel was ineffective for failing to advise him of the mandatory post-release supervision, which accompanied his guilty plea. This argument fails the second prong under the *Strickland* test because Petitioner cannot show prejudice based on his lack of knowledge. Under *Strickland,* a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. Nothing in the record indicates that Petitioner would not have pled had he been informed of the mandatory PRS. *Walker v. Pearlman,* 556 F.Supp.2d 259, 265 (S.D.N.Y.2008) (holding that knowledge of a five-year PRS period would have not changed the defendant's plea).

Petitioner does allege that, had he known about the PRS, he would not have pled guilty. In fact, Petitioner was made fully aware of PRS at his sentencing hearing, and made no objection or any attempt to withdraw his guilty plea. In his *pro se* supplemental brief to the Appellate Division on appeal, Petitioner again did not seek to withdraw his guilty plea. Furthermore, as stated above, had Petitioner gone to trial and been found guilty of the charges, he faced two life sentences. In addition, any period of incarceration connected with these charges carries with them a mandatory period of post-release supervision. N.Y. Penal Law § 70.80(3). Under the circumstances, even assuming *arguendo* the allegation of ineffective assistance to be true, there is no basis to conclude that Petitioner suffered any prejudice under the second prong of *Strickland.*

### 3. Insufficient Allocution

**\*14** Petitioner alleges his allocution was insufficient in establishing the elements of the crimes of which he was convicted. For the reasons stated, the Court finds this claim to be without merit. [7]

#### i. Allocution Under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree)

In analyzing the transcript of the plea, it is clear that Petitioner provided a sufficient allocution for each element of the crimes charged. N.Y. Penal Law § 130.75(1) (Course of sexual conduct against a child in the first degree) reads:

A person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration:

(a) he or she engages in two or more acts of sexual conduct, which includes at least one act of sexual intercourse, oral sexual conduct, anal sexual conduct or aggravated sexual contact, with a child less than eleven years old

N.Y. Penal Law § 130.75(1). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in at least two acts of sexual conduct.

Petitioner admitted in great detail to the specific oral sexual conduct between himself and the victims, which occurred well over a three-month period. Petitioner also admitted that these victims were children under the age of eleven. In particular, during the allocution, petitioner admitted in part that, (1) within a three-month period between 2002 and 2004, on at least three occasions at his residence in Suffolk County, he subjected the female child "DM" (who was under the age of eleven) to sexual contact and sexual intercourse for Petitioner's sexual gratification (P. 7–8); and (2) within a three-month period from between September 2003 and July 2004, on at least three occasions at his residence, Petitioner had sexual contact with the male child "DM" (who was under the age of 11), including one incident of oral sexual conduct. (P. 8–12.) Petitioner's allocution covered all of the requisite elements and was sufficient to find him guilty of the charges under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree).

#### ii. Allocution under Under Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree)

In relevant part, N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree) reads:

A person is guilty of course of sexual conduct against a child in the second degree when, over a period of time not less than three months in duration:

(a) he or she engages in two or more acts of sexual conduct with a child less than eleven years old.

Case 9:14-cv-01230-MAD-TWD    Document 21    Filed 05/17/17    Page 67 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

N.Y. Penal Law § 130.80(1)(a). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in two or more acts of sexual conduct with a child less than eleven years old. "Sexual conduct" means sexual intercourse, oral sexual conduct, anal sexual conduct, aggravated sexual contact, or sexual contact. N.Y. Penal Law § 130.00(10).

 **\*15** The plea transcript provides sufficient evidence that Petitioner is guilty under N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree). As discussed supra, Petitioner admitted to sexual conduct with a child under the age of eleven. He also admitted that this conduct occurred for a period of at least three months. Moreover, he allocuted to conduct that clearly fell within the definition of oral sexual conduct. (P. 9–11 .) Thus, each element under Penal Law § 130.80(1)(a) was satisfied.

Petitioner furthers argues that dialogue between the prosecutor and himself during the plea was insufficient to support the charge because his admission was preceeded by six denials. (Pet'r's Habeas Pet. at 2.) He asserts that the state court should have, "looked further into the reasons of denials of alleged acts before accepting the insufficient pleas." (*Id.* at 2.)

The Court disagrees. By looking at the totality of the guilty plea proceeding, instead of a few isolated lines as Petitioner suggests, it is clear that the plea was voluntary. There is no evidence that the prosecutor or anyone else threatened Petitioner to induce a coerced plea. The court simply gave Petitioner another opportunity to explain what had occurred. Subsequently, Petitioner provided a sufficient allocution and made a proper plea. In short, there is no basis to challenge the Petitioner's statements at the guilty plea, including the voluntariness of those statements.

  iii. Allocution Under Penal Law § 130.65 (Sexual Abuse in the First Degree)

N.Y. Penal Law § 130.65 (Sexual Abuse in the First Degree) states that "[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact: ... [w]hen the other person is less than thirteen years old and the actor is twenty-one years old or older." N.Y. Penal Law § 130.65.

The record is clear that the prosecution satisfied every element of this charge. Petitioner described in great detail sexual acts which satisfy subsection 4 of N.Y. Penal Law § 130.65. Petitioner, by his own admission, subjected his victims, who were all under the age of thirteen, to sexual contact. Because the Petitioner is older than twenty-one years of age, the elements are satisfied, and thus his allocution was sufficient.

  iv. Allocution Under Penal Law § 260.10(1) (Endangering the Welfare of Child)

Lastly, under the N.Y. Penal Law § 260.10(1) (Endangering the Welfare of Child):

A person is guilty of endangering the welfare of a child when:

1. He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health.

N.Y. Penal Law § 260.10(1). There is no requirement under this statute that the physical, mental or moral welfare of the child be in fact injured, and New York courts have held that actions similar to the ones admitted to by Petitioner violate the statute. *See, e .g., People v. Rice,* 17 N.Y.2d 881, 271 N.Y.S.2d 307, 218 N.E.2d 341 (1966); *People v. Dunavin,* 173 A.D.2d 1032, 1034, 570 N.Y.S.2d 369 (3d Dep't 1991) (evidence demonstrating that defendant showed minors sexually explicit film combined with touching minor's buttocks legally sufficient to establish crime of endangering welfare of child). The Court concludes that Petitioner's allocution under Penal Law § 260.10(1) (Endangering the Welfare of Child) was sufficient to satisfy all elements of the crime alleged. (P. 14–16.)

 **\*16** In sum, Petitioner's claim that his allocution did not satisfy the elements of the crimes charged is plainly without merit.

  4. *Brady* and *Rosario* Violations

Petitioner also claims *Brady* and *Rosario* violations, alleging that the prosecution withheld certain exculpatory evidence-namely, the victims' medical records and a finding of 'Not Guilty' in his Family Court case, which

Case 9:14-cv-01230-MAD-TWD   Document 21   Filed 05/17/17   Page 68 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

related to this criminal matter. (Pet. at 3–4) For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

a. Legal Standard

For the purposes of federal habeas corpus review, a habeas petition can only be granted to remedy some violation of federal law. Because the obligation to turn over *Rosario* material arises under state law, to the extent that this claim is based on a *Rosario* violation, it must fail. Thus, the only question is whether the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. *See King v. Greiner,* No. 02–CV–5810, 2008 WL 4410109, at *38 n. 41 (S.D.N.Y. Sept.26, 2008).

Under *Brady,* the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prevail on a *Brady* claim, petitioner must demonstrate that material evidence favorable to his case was not disclosed to him. *See Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Failure to disclose such material evidence merits relief only if the prosecution's failure " 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 678). Furthermore, "[t]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281.

b. Application

Petitioner argues that the outcome of his case would have been different if the prosecutor submitted medical records and a Family Court verdict of 'Not Guilty' of sexual abuse. Analyzing these claims, the Court finds

them to be meritless. With regard to the Family Court adjudication, Petitioner makes conclusory statements without providing a shred of evidence before the Court beside his self-serving declaration.

The state record is devoid of any documentation from Family Court, which would be classified as exculpatory under *Brady.* Additionally, Petitioner failed to produce an affidavit from his attorney attesting to a favorable adjudication in the Family Court. In fact, Respondent submitted to the state court, in response to his Section 440 motion, court documents from Family Court indicating that the abuse petitions were granted on September 23, 2005. (Opp. to Section 440 Motion, Ex. B.)

**\*17** In any event, Petitioner was presumably present in Family Court during the proceedings. Therefore, he was aware of the evidence allegedly withheld, removing it from the scope of *Brady* material. Lastly, as noted above, a final Family Court disposition took place on September 23, 2005. Petitioner pled guilty in Criminal Court on August 30, 2005. There can be no argument that this disposition, which took place later in time, could have possibly influenced the outcome of his guilty plea (which had already taken place).

Similarly, the medical records at issue are neither exculpatory nor favorable to Petitioner. The medical records specifically state that the victims' medical history indicates that "inappropriate sexual contact" occurred. This statement is certainly not favorable to Petitioner. Although the records state that there were no abnormal findings *during* the exam, this has no bearing on whether the victims were abused in the past by Petitioner. Moreover, the medical record qualifies the examination by stating that the alleged acts would not cause "permanent changes in the patient's physical exam." Therefore, the medical records do not exculpate Petitioner and, thus, cannot be classified as *Brady* material. [8]

In sum, Petitioner's *Brady* and *Rosario* claims are without merit and do not provide a basis for habeas relief.

## IV. CONCLUSION

For the reasons set forth herein, this Court finds that Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are

Case 9:14-cv-01230-MAD-TWD   Document 21   Filed 05/17/17   Page 69 of 69

Wilens v. Superintendent of Clinton Correctional Facility, Not Reported in F.Supp.2d...

2014 WL 28995

plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall be issued. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 28995

**Footnotes**

1    "P." refers to the plea transcript.

2    "S." refers to the sentencing transcript.

3    The Court did not address Petitioner's claim that his allocution was insufficient and it would appear that this claim is not cognizable on a § 440.10 motion to vacate. However, when a state court fails to address a claim, a Court must review it *de novo*. *See Cotto v. Fischer,* 09 CV 9813, 2012 WL 5500575, at *39 (S.D.N.Y. Aug.23, 2012). As a threshold matter, Petitioner only addressed this matter in a conclusory manner without any argument as to the specific challenge being made. Thus, the issue was not fairly presented to the state court. In any event, as addressed *infra,* the Court has reviewed this claim and finds it to be plainly without merit.

4    As stated *supra,* even if the state court did violate New York law, Petitioner is also not entitled to relief because this claim is procedurally barred.

5    As Respondent notes, "All terms of incarceration were ordered to run concurrently, for an aggregate sentence of fourteen years for his sexual assaults and lewd behavior against eight children. Had petitioner gone to trial and been found guilty, as a second child sexual assault felony offender, petitioner faced a maximum sentence of two life terms, plus 48 years." (Resp. Opp. at 11.)

6    The Court notes that, for the reasons discussed *infra,* Petitioner has not made any plausible argument that his guilty plea was not voluntary and intelligent that would allow him to now argue that this argument should not be waived.

7    The state court did not address Petitioner's contention that his allocution at his plea was insufficient, and thus, this claim is not entitled to AEDPA deference. *See, e.g., Bell v. Napoli,* 08 CIV 9900, 2010 WL 8039333, at *23 n. 13 (S.D.N.Y. Aug.24, 2010) (Report and Recommendation). However, even under *de novo* review, Petitioner's claim is plainly without merit.

8    In any event, such claims cannot provide a basis for habeas relief. The Supreme Court has never held that exculpatory material must be disclosed prior to a guilty plea. Therefore, a state court decision on that issue could not have been "contrary to clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A habeas petition may not be granted on an issue of law that has not yet been resolved. *See Friedman v. Rehal,* 618 F.3d 142, 154–55 (2d Cir.2010) (discussing *Ruiz* and holding that, because no clearly established federal law has been established as to the application of *Brady* to a guilty plea, such a claim was not cognizable on habeas review).

---

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.